PRENTIS v YALE MANUFACTURING COMPANY

Docket No. 69581. Argued March 6, 1984 (Calendar No. 3).—Decided December 28, 1984. Released February 11, 1985.

John Prentis and Helen Prentis brought a products liability action in the Wayne Circuit Court against Yale Manufacturing Company, seeking damages for injuries received by John Prentis in an accident involving a forklift manufactured by Yale. The plaintiffs alleged negligence, failure to warn, and breach of implied warranty based on an alleged defect in the design of the forklift. The court, Roland L. Olzark, J., refused to instruct the jury on breach of warranty, but properly instructed on the theory of negligent design, and entered judgment for the defendant upon a jury verdict of no cause of action. The Court of Appeals, R. M. Maher, P.J., and Beasley and Marutiak, JJ., reversed, holding that the refusal to give the requested instruction on breach of warranty was error requiring reversal (Docket No. 50381). The defendant appeals.

In an opinion by Justice Boyle, joined by Chief Justice Williams and Justices Ryan and Brickley, the Supreme Court held:

In a products liability action against a manufacturer for an alleged defect in the design of its product, the jury need only be instructed on a single unified theory of negligent design. In this case, the jury was properly instructed on the theory of negligent design, and the trial court's refusal to instruct on breach of warranty was not error requiring reversal.

1. A plaintiff seeking damages for injuries arising out of the use of a defective product must prove a defect attributable to the manufacturer and a causal connection between that defect and the injury. Only then may recovery be had against the manufacturer. While courts have accepted the social policy rationale that those injured by defective products should be compensated for their injuries without being subject to the

---

References for Points in Headnotes

[1-4] 63 Am Jur 2d, Products Liability §§ 372, 375 et seq.
    Products liability: modern cases determining whether product is defectively designed. 96 ALR3d 22.
[3, 4] 63 Am Jur 2d, Products Liability § 533.

contractual intricacies of the law of sales, and have agreed that manufacturers can most effectively distribute the costs of injuries, they have never gone so far as to make manufacturers insurers of their products and thus absolutely liable for any and all injuries sustained from the use of those products. In Michigan, a plaintiff who brings an action based upon negligence or implied warranty is required to prove that the product itself is defective, *i.e.,* that something is wrong with it that makes it dangerous. In the case of a manufacturing defect, the product may be evaluated against the manufacturer's own production standards, as manifested by that manufacturer's other like products. In design defect cases, the court is called upon to supply the standard for defectiveness. Thus, the term "defect" in design cases is an epithet—an expression for a legal conclusion rather than a test for reaching that conclusion.

2. Determination of the meaning of "defect" in design cases requires a risk-utility balancing test, *i.e.,* whether the risk of harm outweighed the utility of a particular design. The issue is whether the manufacturer properly weighed the alternatives and evaluated the trade-offs and thereby developed a reasonably safe product; the focus is unmistakably on the quality of the decision and whether the decision conforms to socially acceptable standards. The liability of the manufacturer rests upon a departure from proper standards of care, so that the tort is essentially a matter of negligence. The competing factors to be weighed under a risk-utility balancing test invite the trier of fact to consider the alternatives and risks faced by the manufacturer and to determine whether in light of these the manufacturer exercised reasonable care in making the design choices it made. Instructing a jury that weighing factors concerning conduct and judgment must yield a conclusion that does not describe conduct is confusing at best.

3. A pure negligence, risk-utility test in products liability actions against manufacturers for alleged design defects defines in a coherent fashion what litigants in cases such as this case argue and what jurors are asked to analyze. Unlike manufacturing defects, design defects result from deliberate and documentable decisions on the part of manufacturers, and plaintiffs should be able to learn the facts surrounding these decisions through liberalized modern discovery rules. Access to expert witnesses and technical data are available to aid plaintiffs in proving the manufacturer's design decision was ill considered. A negligence standard that rewards the careful manufacturer and penalize the careless is more likely to achieve a primary purpose of products liability law, to encourage the design of

safer products and thereby reduce the incidence of injuries. Because a verdict for the plaintiff in a design defect case is the equivalent of a determination that an entire product line is defective, the plaintiff should be required to pass a higher threshold to establish fault. The traditional tort law of negligence better serves this purpose. The fault system incorporates greater intrinsic fairness in that the careful safety-oriented manufacturer will not bear the burden of paying for losses caused by a negligent product seller. It will also follow that customers of a careful manufacturer will not through its prices pay for the negligence of the careless.

4. In this case, the refusal of the trial court to instruct on breach of warranty was not error requiring reversal. Such instructions could have created juror confusion and prejudicial error, would have been repetitive and unnecessary, and could have misled the jury into believing that the plaintiff could recover on the warranty count even if it found there was no defect in the design of the product. This is not to suggest that implied warranty and negligence are not separate and distinct theories of recovery or that the products liability statute has merged all former products liability theories or causes of action into a single unified products liability theory or to dispute the generally recognized distinction between the elements of negligence and breach of warranty. Negligence theory generally focuses on the defendant's conduct, requiring a showing that it was unreasonable, while warranty generally focuses upon the fitness of the product, irrespective of the defendant's conduct. The holding in this case is based upon the recognition that under the common law of products liability, in an action against the manufacturer of a product based upon an alleged defect in its design, breach of implied warranty and negligence involve identical evidence and require proof of exactly the same elements. Although plaintiffs alleged that their injuries were proximately caused by defendant's negligence and breach of an implied warranty, their evidence and proofs at trial focused on the single claim that the defendant defectively designed the forklift in failing to provide a seat or platform for the operator. Recovery under either theory required the jury to determine that the forklift was defectively designed by defendant. The test for determining whether the design was unreasonably dangerous was whether the alleged defect in the design of the product created an unreasonable risk of foreseeable injury. The trial court properly recognized that the standards of liability under the theories of implied warranty and negligence were indistinguishable and that instructions on both would only confuse the jury. Accordingly, the trial judge's instruction regarding the

standard of care and theories of liability properly informed the jury of defendant's legal duties as the manufacturer of the forklift. In essence, the jury was instructed to consider whether the manufacturer took reasonable care in light of any reasonably foreseeable use of the product which might cause harm or injury.

Justice Cavanagh concurred in the result only.

Reversed.

Justice Levin, joined by Justice Kavanagh, dissenting, stated that the products liability statute does not require the jury to determine whether a manufacturer was at fault or to make a finding regarding the manufacturer's conduct. The jury in this case should have been instructed to determine whether the product as designed was reasonably fit for the purposes and uses intended or reasonably foreseeable by the designer-manufacturer, the standard which, until this time, governed the determination of whether a breach of an implied warranty occurred.

116 Mich App 466; 323 NW2d 444 (1982) reversed.

### Opinion of the Court

1. Products Liability — Defective Design — Jury Instructions.

   A jury in a products liability action against a manufacturer for an alleged defect in the design of its product need only be instructed on a single unified theory of negligent design; the issue in such cases is whether the manufacturer, in weighing the alternatives and evaluating the trade-offs in developing the product, departed from the proper standard of care and selected a design that created an unreasonable risk of foreseeable injury (MCL 600.2945 *et seq.;* MSA 27A.2945 *et seq.*).

2. Products Liability — Defective Design — Jury Instructions.

   Determination by a jury of the meaning of "defect" in products liability cases involving the design of a product requires a balancing of the risk of harm occasioned by the design against the design's utility; the factors to be weighed invite the trier of fact to consider the alternatives and risks faced by the manufacturer and to determine whether the manufacturer exercised reasonable care in choosing the design (MCL 600.2945 *et seq.;* MSA 27A.2945 *et seq.*).

3. Products Liability — Defective Design — Implied Warranty — Jury Instructions.

   The refusal by a trial court in a products liability action against a manufacturer, seeking damages on theories of defective design of a product and breach of an implied warranty, to

instruct the jury on the breach of warranty theory was not error requiring reversal where the instructions would have been repetitive of the instructions on defective design, could have created jury confusion and prejudicial error, and could have misled the jury into believing that recovery on the warranty theory could have been had even if no defect in the design was found, and where recovery under either theory required a determination that the product was defectively designed (MCL 600.2945 *et seq.;* MSA 27A.2945 *et seq.*).

DISSENTING OPINION BY LEVIN, J.

4. PRODUCTS LIABILITY — DEFECTIVE DESIGN — JURY INSTRUCTIONS.

*A jury in a products liability action against a manufacturer for an alleged defect in the design of its product need not determine whether the manufacturer was at fault or make a finding regarding the manufacturer's conduct; the jury should be instructed to determine whether the product as designed was reasonably fit for the purposes and uses intended or reasonably foreseeable by the designer-manufacturer, the standard governing whether a breach of an implied warranty occurred (MCL 600.2945-600.2949; MSA 27A.2945-27A.2949).*

*The Jaques Admiralty Law Firm* (by *Leonard C. Jaques*) for the plaintiffs.

*Kerr, Russell & Weber* (by *C. Kenneth Perry, Jr.,* and *Louis G. Corey*) for the defendant.

Amicus Curiae:

*Dickinson, Wright, Moon, VanDusen & Freeman* (by *John E. S. Scott* and *Michael G. Vartanian*) for Michigan Defense Trial Counsel.

BOYLE, J. This products liability action arose out of injuries sustained in an accident involving the operation of a hand-operated forklift manufactured by defendant. The procedural events leading up to this appeal include two trials[1] and two reversals and remands for new trials by the Court of Ap-

[1] The first took place in 1976, the second in 1980.

peals.[2] Plaintiffs John Prentis and his wife, Helen, brought suit alleging both negligence and breach of implied warranty, predicating defendant manufacturer's liability upon the alleged defective design of the forklift. Although the trial judge included both negligence and breach of warranty in his statement of plaintiffs' theory of the case to the jury, he refused to give plaintiffs' requested instructions on breach of implied warranty.[3] A judgment for the defendant, upon a jury verdict of no cause of action, was reversed by the Court of Appeals, which held that the trial court's failure to charge the jury as requested was reversible error, mandating a new trial. *Prentis v Yale Mfg Co,* 116 Mich App 466; 323 NW2d 444 (1982).

We granted leave to appeal and limited our inquiry to the following issue: whether the trial judge's refusal to instruct the jury on breach of warranty was reversible error in this products liability action against a manufacturer for an alleged defect in the design of a product, where the jury was properly instructed on the theory of negligent design.

# I

## FACTS

The facts of this case are not seriously in dis-

[2] The first reversal was based upon the trial court's exclusion of a portion of the testimony of one of plaintiffs' expert witnesses on the alleged design defect. The Court of Appeals in an unpublished per curiam opinion concluded that the excluded testimony was "integrally related to plaintiffs' theory of the case." The second reversal dealt with the issue on which leave was granted herein.

[3] Plaintiffs requested SJI 25.01, 25.02, 25.21, and 25.23 (current versions at SJI2d 25.01, 25.02, 25.21, and 25.22; SJI2d 25.22 replaced SJI 25.23). SJI2d 25.32 was promulgated and adopted after the 1980 trial. SJI2d 25.22 and 25.32 were also recently amended to reflect the application of comparative negligence in all products liability cases. See 63 Mich Bar J 975 (Oct, 1984).

pute. In April of 1970, plaintiff John Prentis, who was employed as foreman of the parts department at an automobile dealership, sustained a hip injury in an accident involving the use of a forklift manufactured by defendant Yale Manufacturing Company and sold to plaintiff's employer in 1952. The forklift was a stand-up or walking type, termed by defendant a "walkie hi-lo" model, rather than a riding or sit down variety. It was operated by lifting its handle up, much like the handle of a wagon. The forklift was estimated by plaintiff to weigh about two thousand pounds and was powered by a large battery, which had to be recharged every night. The machine was equipped with a hand controlled "dead-man" switch which normally prevented it from moving if the operator let go of the handle or controls.

Mr. Prentis, who was sixty-three years old at the time of the accident, had been working at the automobile dealership for two years prior to his injury, and testified that he had occasionally operated the forklift during that period, although he had never been formally instructed as to its operation by his employer. He testified that he was aware of and had previously experienced problems with the machine. After use for five or six hours, the battery charge would run down and the machine would operate erratically. When the battery was low, Mr. Prentis said he would play the handle back and forth to get the machine to start and when he did this the machine was subject to power surges which he said could throw a person off balance if care was not taken. He testified that prior to his accident, the machine had broken through the garage door of the dealership five or six times due to such power surges.

The accident in which Mr. Prentis was injured occurred late in the day, and he testified that he

was aware at the time that the battery charge on the forklift was running low. After using the machine to assist him in placing an engine inside the cargo area of a delivery van, while the forklift was in tow behind him on a slightly inclined ramp leading from the delivery bay, Mr. Prentis attempted to start the machine by working the handle up and down. When the machine experienced a power surge, he lost his footing and fell to the ground. It appears that plaintiff's injuries were a result of the fall only, as the machine did not hit or run over him, but continued past him and stopped when it ran into a parked car. Mr. Prentis received extensive treatment for multiple fractures of his left hip.

Plaintiffs filed suit in August of 1972, alleging negligence, failure to warn, and breach of implied warranty, and the case proceeded to trial in August of 1976. Judgment of no cause of action based upon a jury verdict in favor of the defendant was entered on September 17, 1976, and was reversed by the Court of Appeals in an unpublished opinion dated July 7, 1978. The reversal was based upon a finding that the trial court abused its discretion when it prevented plaintiffs' expert on human factors from expressing his opinion on the design of the machine in question, because he had no experience with that type of machine. The court based its reversal upon a finding that the excluded testimony was integrally related to plaintiffs' theory of the case which was a design defect. Denial of leave by this Court on July 19, 1979, resulted in remand for a second trial which commenced on January 16, 1980.

Plaintiffs' proofs in the 1978 and 1980 cases were identical and included the testimony of both Mr. Prentis and his wife, a treating physician, and two expert witnesses. In the 1980 trial, plaintiffs'

counsel read into evidence the complete testimony of the two experts transcribed in the 1978 trial. The focus of plaintiffs' proofs at both trials was an alleged defect in the design of the forklift, and the substance of the expert witness' testimony was that the design of the forklift failed to properly incorporate the operator as a "human factor" into the machine's function, specifically because it did not provide a seat or platform for the operator.[4] However, in the period between the Court of Appeals reversal and the second trial, Michigan had enacted the "products liability statute," MCL 600.2945 *et seq.;* MSA 27A.2945 *et seq.,* which became effective on December 11, 1978, resulting in some confusion as to the proper legal principles to be applied in this case.

During the course of trial, plaintiffs' counsel

[4] Dr. Julian Christensen, who held a Ph.D. in experimental psychology with an emphasis on human factors, was presented as an expert in human factors as they relate to control of machines. Dr. Christensen testified that:

"This is a long story but essentially, the idea is that man was not properly integrated into this design. A man had to use it. It was designed for a man to use. It was improperly designed for a man to use safely. I think this booklet that he started to introduce, this evidence is an admission on their part that they realized that they had a very dangerous design here. They had to issue all kinds of warnings in this pamphlet and so on.

"Very essentially, you should not allow man to control this kind of power over the machine. He should have been on a platform on the machine that was properly guarded and so on. If it had been designed that way, he would not be in court today." Dr. Christensen's testimony from the first trial was read to the jury.

Plaintiffs' second expert, Herbert Ludwig, a mechanical engineering professor at Wayne State University, also testified that the forklift was unsafe. He too focused on the separation of man from the machine, explaining that the two constituted separate independent moving systems of a dangerous nature because of the ability of the machine to contact the man. He offered the opinion that the man should have been made "a part of the machine, making it one system whereupon the man who was on the machine and moves with it [which movement] would reduce very greatly completely the ability for the machine to contact the man."

requested separate jury instructions on implied
warranty and negligence theories,[5] while counsel
for defendant requested a unified jury instruction.[6]
After considerable discussion and argument and a
careful review and analysis of the most recent case
law under the new statute, the court instructed
the jury on a unified standard of liability by using
an amalgam of the common elements of proof
under the implied warranty and negligence theo-
ries.

The trial judge instructed the jury on:

1) Defendant's duties and liabilities as a manu-
facturer:

"A manufacturer of a product made under a plan or
design which makes it dangerous for uses for which it is
manufactured is . . . subject to liability to others whom
he should expect to use the product or to be endangered
by its probable use from physical harm caused by his
failure to exercise reasonable care in the adoption of a
safe plan or design.

"A manufacturer has a duty to use reasonable care in

[5] See fn 3. The request was based in part upon the assertion that
the comparative negligence of plaintiff should not be considered
because the Michigan products liability statute should not be applied
retroactively, and that even if it could be applied to the negligence
claim, it should not be considered with respect to the implied war-
ranty claim. These issues were subsequently resolved by this Court's
decision in *In re Certified Questions, Karl v Bryant Air Conditioning
Co*, 416 Mich 558; 331 NW2d 456 (1982), and are no longer disputed
here.

[6] This request was based upon the argument that the Michigan
products liability statute merged the theories of recovery based on
negligence and implied warranty. However, counsel for defendant
conceded in oral argument before this Court that: "As to a seller
there may very well be [a distinction between negligence and the
warranty theory]. . . . [T]here may well be some circumstances where
an implied warranty recovery might occur in a case despite the fact
that there was no negligence." But, he maintained that in this case,
where the seller was also the manufacturer, and the case was based upon
a defect in design of the product, the instructions given blended the
negligence and implied warranty theories and were appropriate.

designing his product and guard it against a foreseeable and unreasonable risk of injury and this may even include misuse which might reasonably be anticipated."

2) Negligent conduct of both plaintiff and defendant:

"Now when I use the word 'negligence' with respect to the Defendant's conduct, I mean the failure to do something which a reasonably careful person would do or the doing of something which a reasonably careful person would not do under the circumstances which you find existed in this case.

"It is for you to decide what a reasonably careful person would do or not do under the circumstances.

"When I use the words 'ordinary care,' I mean the care a reasonably careful person would use under the circumstances which you find existed in this case. The law does not say what a reasonably careful person would do or would not do under such circumstances. That is for you to decide.

"Now it was the duty of the Plaintiff in connection with this occurrence to use reasonable care for his own safety, and it was the duty of the Defendant in connection with this occurrence to use ordinary care for the safety of the Plaintiff."

Following the jury instructions on liability, the court read both parties' written theories of the case to the jury, including plaintiffs' claims under both negligence and breach of warranty. The jury panel was then given a special verdict form which first asked the following question:

"Question No. 1: Was the motorized hand truck defectively designed by Yale Manufacturing Company?

"Answer: — (Yes or No).

"(If your answer is no, do not answer any further questions)."

Question No. 1 was answered in the negative by

the jury panel, and a judgment of no cause of action was entered by the trial court on February 28, 1980.

Plaintiff filed a timely claim of appeal in the Court of Appeals. On May 20, 1982, the Court of Appeals issued a published per curiam opinion reversing the trial court judgment and remanding for a new trial. *Prentis v Yale,* 116 Mich App 466; 323 NW2d 444 (1982). The Court of Appeals held that the trial court's failure to give the properly requested jury instruction on implied warranty was reversible error requiring a new trial. We granted defendant's application for leave to appeal on June 28, 1983. 417 Mich 1039 (1983).

## II

### ANALYSIS OF THE CURRENT STATUS OF THE LAW REGARDING MANUFACTURERS' LIABILITY FOR DEFECTIVE DESIGN

The development of the law of tort liability for physical injury caused by products is perhaps the most striking and dramatic of all the numerous stories in the portfolio of modern tort scenarios.[7] When the societal goal of holding manufacturers accountable for the safety of their products has been threatened by the interposition of technical rules of law, it has been the rules that have gradually given way.[8]

However, this has never meant that courts have

---

[7] Wade, *On product "design defects" and their actionability,* 33 Van L R 551 (1980).

[8] Since the landmark decision in *Henningson v Bloomfield Motors, Inc,* 32 NJ 358; 161 A2d 69 (1960), such firmly imbedded concepts as privity, lack of notice, and the innocent bystander rule have all but vanished as single-factor no-duty tests that immunize a defendant from liability. See, *e.g., Piercefield v Remington Arms Co, Inc,* 375 Mich 85; 133 NW2d 129 (1965). Other bars such as contributory negligence have been mitigated by application of comparative negligence. See MCL 600.2949; MSA 27A.2949.

been willing to impose absolute liability in this context and from their earliest application, theories of products liability have been viewed as tort doctrines which should not be confused with the imposition of absolute liability. As this Court noted in *Piercefield v Remington Arms Co, Inc,* 375 Mich 85, 98-99; 133 NW2d 129 (1965):

"Some quibbler may allege that this is liability without fault. It is not. . . . [A] plaintiff relying upon the rule must prove a defect attributable to the manufacturer and causal connection between that defect and the injury or damage of which he complains. When able to do that, then and only then may he recover against the manufacturer of the defective product."[9]

Thus while courts have accepted the social policy rationale that those injured by defective products should be compensated for their injuries without being subject to the contractual intricacies of the law of sales, and have agreed that manufacturers can most effectively distribute the costs of injuries,[10] they have never gone so far as to make

---

[9] We do not agree with Justice LEVIN's dissent, *post*, p 697, that this Court abandoned fault concepts in *Piercefield.* The concepts repudiated in *Piercefield* were privity of contract and the notice requirements of the uniform sales act. See *Piercefield,* pp 99-100. See also text accompanying fn 10. Although the Court found the instructions on both negligence and warranty theories proper in *Piercefield,* the basis for liability in that case was an alleged manufacturing defect, an issue not before us in this case. Nor do we interpret the decision in *Piercefield* as an adoption of the concept of strict liability in tort. Justice LEVIN pointed this out himself in his oft-cited opinion in *Cova v Harley Davidson Motor Co,* 26 Mich App 602, 612-614; 182 NW2d 800 (1970), where he explained the potential for confusion of "strict" liability with "absolute" liability, which "generally arises without regard to whether there is a "defect," *id.,* p 613, fn 24. He examined with approval the refusal of Michigan courts to adopt such a potentially misleading and confusing standard.

[10] See, *e.g., Piercefield, supra.* See also *Phillips v Kimwood Machine Co,* 269 Or 485, 503-504; 525 P2d 1033 (1974). For some of the more searching analyses of these rationales by law and economic theorists, see Calabresi, *The Cost of Accidents* (1970); Posner, *Economic Analysis of Law* (2d ed), §§ 6.11-6.12; Calabresi & Hirschoff, *Toward a test*

sellers insurers of their products and thus absolutely liable for any and all injuries sustained from the use of those products.[11]

Like the courts in every other state, whether a suit is based upon negligence or implied warranty, we require the plaintiff to prove that the product itself is actionable—that something is wrong with it that makes it dangerous. This idea of "something wrong" is usually expressed by the adjective "defective" and the plaintiff must, *in every case, in every jurisdiction,* show that the product was defective. See, *e.g., Piercefield, supra.*

As a term of art, "defective" gives little difficulty when something goes wrong in the manufacturing process and the product is not in its intended condition. In the case of a "manufacturing defect," the product may be evaluated against the manufacturer's own production standards, as manifested by that manufacturer's other like products.[12]

However, injuries caused by the condition of a product may also be actionable if the product's design, which is the result of intentional design decisions of the manufacturer, is not sufficiently safe. Conscious design defect cases provide no such

---

*for strict liability in torts,* 81 Yale L J 1055 (1972); Coase, *The problem of social cost,* 3 J Law & Econ 1 (1960); Ehrlich & Posner, *An economic analysis of legal rulemaking,* 3 J Leg Studies 257 (1974); Henderson, *Extending the boundaries of strict products liability,* 128 U Pa L R 1036 (1980); Klemme, *The enterprise liability theory of torts,* 47 U Colo L R 153 (1976); Landes & Posner, *The positive economic theory of tort law,* 15 Ga L R 851 (1981); Posner, *A reply to some recent criticisms of the efficiency theory of the common law,* 9 Hofstra L R 775 (1981); *Symposium on efficiency as a legal concern,* 8 Hofstra L R 485 (1980); *A response to the efficiency symposium,* 8 Hofstra L R 811 (1980).

[11] See, *e.g., Parsonson v Construction Equipment Co,* 386 Mich 61, 64-65; 191 NW2d 465 (1971), and cases cited therein.

[12] Birnbaum, *Unmasking the test for design defect: From negligence [to warranty] to strict liability to negligence,* 33 Van L R 593, 598 (1980); Traynor, *The ways and meanings of defective products and strict liability,* 32 Tenn L R 363 (1965). Traynor calls this the "deviation-from-the-norm test." *Id.,* p 367.

simple test. The very question whether a defect in fact exists is central to a court's inquiry. It is only in design defect cases that a court is called upon to supply the standard for defectiveness.[13] Thus, the term "defect" in design cases is "an epithet—an expression for the legal conclusion rather than a test for reaching that conclusion." See Wade, *On product "design defects" and their actionability,* 33 Van L R 551, 552 (1980).

At present, questions related to "design defects" and the determination of when a product is defective, because of the nature of its design, appear to be the most agitated and controversial issues before the courts in the field of products liability.[14] A

[13] See Twerski & Weinstein, *A critique of the uniform product liability law—A rush to judgment,* 28 Drake L R 221 (1978-1979), for analysis of the many problems implicit in distinguishing between manufacturing and design defects for the purpose of imposing liability.

[14] In observing the struggle of courts and commentators to define the contours of actionable design defects Professor Twerski noted:

"It may now be true that defect, like obscenity in Justice Stewart's definition, will be discovered by sense impression. Unfortunately 'I know it when I see it' will not suffice as a judicial standard for products liability." Twerski, *From defect to cause to comparative fault—Rethinking some product liability concepts,* 60 Marq L R 297, 304-305 (1977) (referring to Justice Stewart's concurrence regarding the definition of "obscenity" in *Jacobellis v Ohio,* 378 US 184, 197; 84 S Ct 1676; 12 L Ed 2d 793 [1964]).

Most of the literature on products liability of the past decade has focused on establishing standards for design defect. See Birnbaum, fn 12 *supra;* Epstein, *Products liability: The search for the middle ground,* 56 NC L R 643 (1978); Henderson, *Judicial review of manufacturers' conscious design choices: The limits of adjudication,* 73 Colum L R 1531 (1973); Henderson, *Expanding the negligence concept: Retreat from the rule of law,* 51 Ind L J 467 (1976); Henderson, *Manufacturers' liability for defective product design: A proposed statutory reform,* 56 NC L R 625 (1978); Henderson, *Renewed judicial controversy over defective product design: Toward the preservation of an emerging consensus,* 63 Minn L R 773 (1979); Henderson, *Process constraints in tort,* 67 Cornell L R 901 (1982); Hoenig, *Product designs and strict tort liability: Is there a better approach?,* 8 SW L R 109 (1976); Keeton, *Products liability—Design hazards and the meaning of defect,* 10 Cumb L R 293 (1979); Phillips, *The standard for determining defectiveness in products liability,* 46 Cin L R 101 (1977); Schwartz, *Foreward: Understanding products liability,* 67 Cal L R 435

number of appellate courts, aware that they are engaged in the conscious task of molding the law of products liability, have become concerned that they are not differentiating with sufficient clarity between various theories of recovery in design defect cases. In response, they have sought to devise significant and well-articulated distinctions.[15] At the same time, other courts have become concerned that the differentiation is too great, and have attempted to devise means of keeping the broad scope of liability in check.[16] The result has been several cases in which the standard for liability in the design area has been very carefully examined by courts and often vigorously debated by the judges themselves. A survey of the important recent cases in neighboring jurisdictions suggests something of the creative ferment underlying what has been described as the "rich tapestry" of the developing common law of products liability.[17]

The approaches for determination of the mean-

(1979); Twerski, *Seizing the middle ground between rules and standards in design defect litigation: Advancing directed verdict practice in the law of torts,* 57 NYU L R 521 (1982); Twerski, *From risk-utility to consumer expectations: Enhancing the role of judicial screening in product liability litigation,* 11 Hofstra L R 861 (1983); Twerski, Weinstein, Donaher & Piehler, *The use and abuse of warnings in products liability—Design defect comes of age,* 61 Cornell L R 495 (1976); Wade, fn 7 *supra.*

[15] See, *e.g., Barker v Lull Engineering Co, Inc,* 20 Cal 3d 413; 143 Cal Rptr 225; 573 P2d 443 (1978), in which the California Supreme Court attempted to distinguish strict liability from negligence in its reexamination of the concept of defect in design defect cases. At least one commentator has observed that "in so doing, [the California Supreme Court] has further confused the delineation between strict liability and negligence concepts." Birnbaum, fn 12 *supra,* p 601.

[16] See, *e.g., Brady v Melody Homes,* 121 Ariz App 253; 589 P2d 896 (1978).

[17] See Twerski & Weinstein, *A critique of the uniform product liability law—A rush to judgment,* fn 13 *supra,* p 223, for discussion of these cases. See also the debate among members of the New Jersey Supreme Court in *Suter v San Angelo Foundry & Machine Co,* 81 NJ 150; 406 A2d 140 (1979).

ing of "defect" in design cases fall into four general categories. The first, usually associated with Dean Wade, employs a negligence risk-utility analysis, but focuses upon whether the manufacturer would be judged negligent if it had known of the product's dangerous condition at the time it was marketed.[18] The second, associated with Dean Keeton, compares the risk and utility of the product at the time of trial.[19] The third focuses on consumer expectations about the product.[20] The fourth combines the risk-utility and consumer-expectation tests.[21] While courts have included many other individual variations in their formulations,[22] the overwhelming consensus among courts deciding defective design cases is in the use of some form of risk-utility analysis, either as an exclusive or alternative ground of liability.[23] Risk-utility analysis in

[18] This has been characterized as a risk-utility test with imputed knowledge of all risks "knowable" at the time of manufacture or sale. See Wade, *On the nature of strict tort liability for products,* 44 Miss L J 825, 834-835 (1973).

[19] See Keeton, *Manufacturer's liability: The meaning of "defect" in the manufacture and design of products,* 20 Syracuse L R 559, 569-571 (1969). This approach imputes knowledge at the time of trial, even if the risk was unknowable at the time of manufacture or sale. Thus, the disagreement between Wade and Keeton is over the time factor. Keeton would hold a manufacturer liable when the risks of use of its product exceed its utility, based upon information available at the time of trial, even if those risks were unknowable at the time of manufacture or sale. Wade would not.

[20] See 2 Restatement Torts, 2d, § 402A, Comment i. This test is said to have its origin in contract and warranty principles and has been severely criticized because of the haphazard subjectivity involved in its application. See Birnbaum, fn 12 *supra,* pp 611-618. But see Twerski, *From risk-utility to consumer expectations,* fn 14 *supra.*

[21] A number of courts have embraced a combined standard. See, *e.g., Caterpillar Tractor Co v Beck,* 593 P2d 871, 885 (Alas, 1979); *Barker v Lull Engineering Co,* 20 Cal 3d 413, 432; 143 Cal Rptr 225; 573 P2d 443 (1978); *Suter v San Angelo Foundry & Machine Co,* 81 NJ 150, 170-171; 406 A2d 140 (1979).

[22] These include: placing the burden of proof on defendant once plaintiff has made a prima facie case, see, *e.g., Barker, supra,* and imputing knowledge of the danger to the manufacturer, see, *e.g., Suter,* fn 21 *supra,* p 172.

[23] See, *e.g., Caterpillar Tractor Co,* fn 21 *supra* (alternative ground);

this context always involves assessment of the decisions made by manufacturers with respect to the design of their products.

"The law purports to stand as a watchdog to ensure that product design decisions made by manufacturers do not expose product users to unreasonable risks of injury. Thus, in a design defect case, the issue is whether the manufacturer properly weighed the alternatives and evaluated the trade-offs and thereby developed a reasonably safe product; the focus is unmistakably on the *quality* of the decision and whether the decision conforms to socially acceptable standards."[24]

The risk-utility balancing test is merely a detailed version of Judge Learned Hand's negligence calculus. See *United States v Carroll Towing Co,* 159 F2d 169, 173 (CA 2, 1947). As Dean Prosser has pointed out, the liability of the manufacturer rests "upon a departure from proper standards of care, so that the tort is essentially a matter of negligence."[25]

Although many courts have insisted that the

*Barker, supra* (alternative ground); *Suter,* fn 21 *supra* (alternative ground); *Micallef v Miehle Co,* 39 NY2d 376; 384 NYS2d 115; 348 NE2d 571 (1976) (exclusive ground); *Wilson v Piper Aircraft Corp,* 282 Or 61; 577 P2d 1322 (1978) (exclusive ground). It should be noted that these cases were decided in jurisdictions that have adopted the doctrine of strict liability in tort which this Court has never expressly adopted. See fn 9. However, this distinction is not fatal to our analysis. See fn 25 and accompanying text.

[24] Twerski, Weinstein, Donaher & Piehler, *Shifting perspectives in products liability: From quality to process standards,* 55 NYU L R 347, 359 (1980). Evaluation of trade-offs may take into account factors such as design or performance requirements, the effects of those requirements on reducing hazards, the utility and cost of the product, and technological capabilities. *Id.,* p 357.

[25] Prosser, Torts (4th ed), § 96, p 644. This discussion took place in the context of strict liability in tort, which, contrary to the assertions of Justice LEVIN in his dissent, this Court has never adopted. See *post,* p 697 (LEVIN, J., *dissenting),* see also fn 9. However, as Prosser emphasized in the quoted passage, even in jurisdictions that have adopted the strict liability doctrine, the proper test for determining a manufacturer's liability for defective design is negligence.

risk-utility tests they are applying are not negligence tests because their focus is on the *product* rather than the manufacturer's *conduct,* see, *e.g., Barker v Lull Engineering Co, Inc,* 20 Cal 3d 413, 418; 143 Cal Rptr 225; 573 P2d 443 (1978), the distinction on closer examination appears to be nothing more than semantic. As a common-sense matter, the jury weighs competing factors presented in evidence and reaches a conclusion about the judgment or decision *(i.e., conduct)* of the manufacturer. The underlying negligence calculus is inescapable. As noted by Professor Birnbaum:

"When a jury decides that the risk of harm outweighs the utility of a particular design (that the product is not as safe as it *should* be) it is saying that in choosing the particular design and cost trade-offs, the manufacturer exposed the consumer to greater risk of danger than he should have. Conceptually and analytically, this approach bespeaks negligence." Birnbaum, *Unmasking the test for design defect: From negligence [to warranty] to strict liability to negligence,* 33 Van L R 593, 610 (1980) (quoting *Barker v Lull Engineering, supra,* p 432) (emphasis added).

The competing factors to be weighed under a risk-utility balancing test invite the trier of fact to consider the alternatives and risks faced by the manufacturer and to determine whether in light of these the manufacturer exercised reasonable care in making the design choices it made. Instructing a jury that weighing factors concerning conduct and judgment must yield a conclusion that does not describe conduct is confusing at best.

The Model Uniform Product Liability Act was published in 1979 by the Department of Commerce for voluntary use by the states.[26] The act adopts a negligence or fault system with re-

[26] 44 Fed Reg 62,714 (1979) (hereinafter UPLA).

spect to design defects.[27] It is important to examine the rationale underlying the UPLA's adoption of negligence as the criteria for liability in design defect cases. The drafters rejected, as a reason for application of strict liability to design defect cases, the theory of risk distribution wherein the product seller distributes the costs of all product-related risks through liability insurance. They believe that a "firmer liability foundation" than strict liability is needed in a design defect case because the whole product line is at risk. Furthermore, the drafters believed that a fault system would provide greater incentives for loss prevention.[28]

The approach of the UPLA has been approved by several commentators, whose analysis is also instructive.[29] First, unlike manufacturing defects, design defects result from deliberate and documentable decisions on the part of manufacturers, and plaintiffs should be able to learn the facts surrounding these decisions through liberalized modern discovery rules. Access to expert witnesses and technical data are available to aid plaintiffs in proving the manufacturer's design decision was ill considered.

Second, to the extent that a primary purpose of products liability law is to encourage the design of

---

[27] Although the act does not specifically include use of the word "negligence," the drafters characterize the design defect portion of the model act as having "its roots in the law of negligence . . . put into modern and appropriate product liability terminology." UPLA, § 104, analysis, citing *United States v Carroll Towing Co,* 159 F2d 173 (CA 2, 1947) (the Learned Hand formula). The balancing test provided by the UPLA for determination of design defect, and the list of evidence deemed especially probative in making that evaluation, clearly requires a determination as to whether the manufacturer acted reasonably under all of the circumstances. It is a fault concept. *Id.,* § 104(B). See also Elfin, *The changing philosophy of products liability and the proposed model uniform product liability acts,* 19 Am Bus L J 267, 291 (1981).

[28] UPLA, § 104 analysis.

[29] See Elfin, fn 27 *supra,* pp 293-294; Birnbaum, *supra,* pp 593-594.

safer products and thereby reduce the incidence of injuries, a negligence standard that would reward the careful manufacturer and penalize the careless is more likely to achieve that purpose. A greater incentive to design safer products will result from a fault system where resources devoted to careful and safe design will pay dividends in the form of fewer claims and lower insurance premiums for the manufacturer with a good design safety record. The incentive will result from the knowledge that a distinction is made between those who are careful and those who are not.

Third, a verdict for the plaintiff in a design defect case is the equivalent of a determination that an entire product line is defective. It usually will involve a significant portion of the manufacturer's assets and the public may be deprived of a product. Thus, the plaintiff should be required to pass the higher threshold of a fault test in order to threaten an entire product line. The traditional tort law of negligence better serves this purpose.

Fourth, a fault system incorporates greater intrinsic fairness in that the careful safety-oriented manufacturer will not bear the burden of paying for losses caused by the negligent product seller. It will also follow that the customers of the careful manufacturer will not through its prices pay for the negligence of the careless. As a final bonus, the careful manufacturer with fewer claims and lower insurance premiums may, through lower prices as well as safer products, attract the customers of less careful competitors.

We find the formula adopted by the UPLA on the question of defective design to have the merit of being clear and understandable. We recognize that in products liability cases against manufacturers based upon alleged defects in the design of a product, the courts of this state have attempted

to avoid both the notion of fault implicit in negligence and the harshness of no-fault implicit in absolute liability. Thus, on the basis of the heritage of contract and sales law underlying concepts of implied warranty, we have in the past approved instructions that attempted to focus a jury's attention on the condition of a product rather than on the reasonableness of the manufacturer's conduct or decision. We are persuaded that in so doing in the context of cases against the manufacturers of products *based upon allegations of defective design,* we have engaged in a process that may have served to confuse, rather than enlighten, jurors, who must ultimately apply understandable guidelines if they are to justly adjudicate the rights and duties of all parties. Imposing a negligence standard for design defect litigation is only to define in a coherent fashion what our litigants in this case are in fact arguing and what our jurors are in essence analyzing. Thus we adopt, forthrightly, a pure negligence, risk-utility test in products liability actions against manufacturers of products, where liability is predicated upon defective design.

## III

### APPLICATION TO THE FACTS OF THIS CASE

We hold that in this products liability action against a manufacturer for an alleged defect in the design of its product, where the jury was properly instructed on the theory of negligent design, the trial judge's refusal to instruct on breach of warranty was not reversible error. Such instructions could have created juror confusion and prejudicial error. Indeed, such an instruction would have been repetitive and unnecessary and could have misled the jury into believing that plaintiff could recover on the warranty count even

if it found there was no "defect" in the design of the product. See *Smith v E R Squibb & Sons,* 405 Mich 79, 91; 273 NW2d 476 (1979).

This opinion is limited solely to its facts. We do not suggest that implied warranty and negligence are not separate and distinct theories of recovery; see *Squibb, supra,* p 98 (LEVIN, J., *dissenting),* or that the Michigan products liability statute, MCL 600.2945; MSA 27A.2945, has merged all former products liability theories or causes of action into a single unified "products liability theory."[30] We do not dispute the generally recognized distinction between the elements of negligence and breach of warranty. We recognize that the negligence theory generally focuses on the defendant's conduct, requiring a showing that it was unreasonable, while warranty generally focuses upon the fitness of the product, irrespective of the defendant's conduct. See *Squibb, supra,* pp 98-99 (LEVIN, J., *dissenting).*

This holding is based upon the recognition that under the common law of products liability, in an action against the manufacturer of a product based upon an alleged defect in its design, "breach of implied warranty and negligence involve identical evidence and require proof of exactly the same elements." See *Squibb, supra,* p 88. A manufacturer has a duty to design its product so as to

---

[30] *Cf. Jorae v Clinton Crop Service,* 465 F Supp 952 (ED Mich, 1979). As we noted in *In re Certified Questions, Karl v Bryant Air Conditioning Co,* fn 5 *supra,* p 567, "Our reading of the statute does not require us to determine whether the Legislature completed the possible confluence of products liability negligence and implied warranty into one cause of action or whether two separate actions still remain extant."

Thus, as defense counsel has conceded, see fn 6, the only time the distinction between implied warranty and negligence may have any significance in design defect cases, is in determining the liability of a seller who is not also the manufacturer of a product. See, *e.g., Bronson v J L Hudson Co,* 376 Mich 98; 135 NW2d 388 (1965). We also are not required to determine whether the two theories are separate in cases alleging defects in manufacturing.

eliminate any unreasonable risk of foreseeable injury. *Owens v Allis-Chalmers Corp,* 414 Mich 413, 425; 326 NW2d 372 (1982). For the lack of reasonable care in the face of such duty, the manufacturer may be answerable in a negligence action. *Elsasser v American Motors Corp,* 81 Mich App 379, 384; 265 NW2d 339 (1978). When proceeding under a theory of implied warranty, a design defect is established by proof that the product is not reasonably safe for the uses intended, anticipated, or reasonably foreseeable. *Dooms v Stewart Bolling & Co,* 68 Mich App 5, 14; 241 NW2d 738 (1976), *lv den* 397 Mich 862 (1976). For the sale of a product defective in such respect, the seller may be answerable for breach of an implied warranty. *Elsasser, supra.* Thus, when the issue is liability of a manufacturer who was also the seller, it is inconceivable that a jury could determine that the manufacturer had not breached its duty of reasonable care and at the same time find that the product was not reasonably safe for its reasonably foreseeable uses. The question in either case turns on reasonable care and reasonable safety, and as pointed out by Dean Prosser, the liability of the manufacturer rests "upon a departure from proper standards of care so that the tort is essentially a matter of negligence."[31]

Applying these principles to the facts of this case, although plaintiffs alleged that their injuries were proximately caused by defendant's negligence and breach of an implied warranty, their evidence and proofs at trial focused on the single claim that the defendant *defectively designed* the "walkie hi-lo" forklift, because it failed to provide a seat or platform for the operator. Thus, recovery under either theory required the jury to determine that

[31] Prosser, Torts (4th ed), § 96, p 644. See also text accompanying fns 24-26.

the forklift was defectively designed by defendant. *Caldwell v Fox,* 394 Mich 401; 231 NW2d 46 (1975). The factual inquiry was: whether the design of defendant's forklift was "unreasonably dangerous" because it did not contain a seat or platform for the operator. See *Owens, supra,* p 427.

The test for determining whether the design was "unreasonably dangerous" was: whether the alleged defect in the design of the product created an unreasonable risk of foreseeable injury. *Elsasser, supra.* Stated another way, whether the manufacturer was under a duty to use reasonable care to design a product that was reasonably safe for its intended, anticipated, or reasonably foreseeable uses. *Dooms v Stewart Bolling, supra,* p 14.

The trial court properly recognized that the standards of liability under the theories of implied warranty and negligence were indistinguishable and that instructions on both would only confuse the jury. Accordingly, the trial judge's instructions regarding the standard of care and theories of liability properly informed the jury of defendant's legal duties as the manufacturer of the forklift. The court set forth the necessary elements for determining whether defendant defectively designed the forklift when it stated:

"A manufacturer of a product made under a plan or design which makes it dangerous for uses for which it is manufactured is[, however,] subject to liability to others whom he should expect to use the product or to be endangered by its probable use from physical harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design.

"A manufacturer has a duty to use reasonable care in designing his product and guard it against a foreseeable and unreasonable risk of injury and this may even include misuse which might reasonably be anticipated."

In essence, the jury was instructed to consider

whether the manufacturer took reasonable care in light of any reasonably foreseeable use of the product which might cause harm or injury. *Caldwell v Fox, supra.*

Therefore we hold that in a products liability action against a manufacturer, based upon defective design, the jury need only be instructed on a single unified theory of negligent design.[32]

The judgment of the Court of Appeals is reversed, and the judgment of the trial court is reinstated.

WILLIAMS, C.J., and RYAN and BRICKLEY, JJ., concurred with BOYLE, J.

CAVANAGH, J., concurred in the result only.

LEVIN, J. *(dissenting).* The opinion of the Court states that the trial court "instructed the jury on a unified standard of liability by using an amalgam of the common elements of proof under the implied warranty and negligence theories."[1] The opinion also states that the "trial court properly recognized that the standards of liability under the theories of implied warranty and negligence were indistinguishable, and that instructions on both would only confuse the jury."[2] Accordingly, the trial judge's instructions—the "amalgam" of the "indistinguishable" implied warranty and negligence theories—properly informed the jury of the "necessary elements for determining whether defendant defectively designed the fork-lift" when he

---

[32] We thus approve the use of the recently adopted version of SJI2d 25.32, but disapprove of the use of SJI2d 25.22 in the case of products liability actions against the manufacturer of a product where the action is based upon an alleged design defect. Directed verdict forms should also be corrected to reflect these changes.

[1] *Ante,* p 679.

[2] *Ante,* p 694.

stated that "a manufacturer of a product made under a plan or design which makes it dangerous for uses for which it is manufactured" is subject to liability for "physical harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design," and when he instructed— whether conjunctively or alternatively is unclear— that the manufacturer has a duty "to use reasonable care in designing his product and guard it against a foreseeable and unreasonable risk of injury, and this may even include misuse which might reasonably be anticipated."[3]

The opinion of the Court further states that the essence of the judge's instruction was that the jury should "consider whether the manufacturer took reasonable care in light of any reasonably foreseeable use of the product which might cause harm or injury."[4] In conclusion, the opinion of the Court states that in a product liability action "against a manufacturer, based upon defective design, the jury need only be instructed on a single unified theory of negligent design."[5]

I

We agree that there is a risk of confusing the jurors in asking them to focus, in their evaluation of one count of the complaint, on whether the manufacturer's *conduct* measures up to the law's standard of care, and asking them, in their evaluation of another count of the complaint, to put aside from their consideration whether the manufacturer was at fault and to focus solely on

[3] *Ante,* p 694.

[4] *Ante,* pp 694-695.

[5] *Ante,* p 695.

whether the *product* is reasonably fit.[6] That there may be such confusion does not decide what is the correct form of the inquiry.

The construction of the products liability statute[7] that we believe to be correct would not require the jury to determine whether the manufacturer was at fault or to make a finding regarding the manufacturer's conduct.[8] The jury in the instant case should have been instructed to determine whether the product as designed was reasonably fit for the purposes and uses intended or reasonably foreseeable by the designer-manufacturer, the standard which, until today, governed the determination of whether there has been a breach of the implied warranty.

We had thought that the policy question whether the jury should be asked to assess the manufacturer's conduct or the fitness of the product had been decided by the evolvement of products liability law from the negligence-fault concept to the concept of strict liability in effect adopted by this Court in *Piercefield v Remington Arms Co,* 375 Mich 85; 133 NW2d 129 (1965), and set forth in 2 Restatement Torts, 2d, § 402A, pp 347-348.[9]

---

[6] See *Cova v Harley Davidson Motor Co,* 26 Mich App 602; 182 NW2d 800 (1970), advocating the adoption of a single unified theory of products liability.

[7] MCL 600.2945-600.2949; MSA 27A.2945-27A.2949.

[8] Amicus curiae Michigan Defense Trial Counsel contends only that "[m]anufacturers have a duty to produce a *product* which is not unreasonably dangerous in light of the foreseeable risks of injury," "a *product* which is not unreasonably dangerous in light of the foreseeable risk of injury." (Emphasis added.)

[9] See, Comment: *Products liability in Michigan: Implied warranty, strict tort, or both?,* 15 Wayne L R 1558, 1580 (1969) ("In *Piercefield v Remington Arms Co,* the Michigan Supreme Court adopted the strict tort doctrine under the guise of the implied warranty theory"). See also *Williams v Detroit Edison Co,* 63 Mich App 559, 567; 234 NW2d 702 (1975) ("Regardless of whether the tortious conduct is labeled a breach of warranty or whether the claim is founded on strict liability in tort, it seems that plaintiff must basically prove [the same ele-

## II

The opinion of the Court discusses the various theories of design defect liability and acknowledges that courts "have insisted that the risk-utility tests they are applying are not negligence tests because their focus is on the *product* rather than the manufacturer's *conduct*" (emphasis in original), but states that "the distinction on closer examination appears to be nothing more than semantic."[10]

The opinion of the Court cites four general approaches for determining the meaning of defect. These approaches focus on the product, and not on the manufacturer's conduct. The consumer expectation test emphasizes expectations "about the *product*," and not about manufacturer conduct. The three risk-utility formulations also concentrate on the product. While the risk-utility tests may involve "assessment of the *decisions* made by manufacturers with respect to the design of their products,"[11] (emphasis added) it does not appear that the assessment determinative of the manufacturer's *liability* for a product affected by a design defect is the identical assessment made when judg-

ments]"); *Owens v Allis-Chalmers Corp,* 83 Mich App 74, 78; 268 NW2d 291 (1978) ("This Court has recognized that the requisite elements for a cause of action based upon strict liability in tort are congruent to those for breach of warranty"); *Tulkku v Mackworth Rees (On Remand),* 101 Mich App 709, 722, fn 4; 301 NW2d 46 (1980) ("[T]he Michigan doctrine of implied warranty of fitness is worded differently, but is virtually indistinguishable in concept and practical effect [from the concept of strict liability in tort]"); *Johnson v Chrysler Corp,* 74 Mich App 532, 535; 254 NW2d 569 (1977) ("If anything, the proofs that would be presented under a strict liability theory in a product case would overlap with the proofs that would be presented under an implied warranty theory"); similarly, see *Dooms v Stewart Bolling & Co,* 68 Mich App 5, 15; 241 NW2d 738 (1976); *Auto-Owners Ins Co v Chrysler Corp,* 129 Mich App 38, 43, fn 1; 341 NW2d 223 (1983).

[10] *Ante,* p 688.

[11] *Ante,* pp 686-687.

ing the reasonableness of the manufacturer-designer's decision.

The authorities cited by the Court illustrate this point. In only one of the five cited cases would the court look to the manufacturer's conduct to determine liability, and in that case the court's statement was dictum.[12]

Dean Keeton advocated weighing the risk and utility of the product at the time of trial.[13] Keeton would use hindsight to allocate to the manufacturer all risks including those which were *unknowable* at the time of marketing.[14] While a manufacturer could not be found *negligent* for

[12] *Caterpillar Tractor Co v Beck,* 593 P2d 871, 876 (Alas, 1979) (jury instructed that "[a] design defect is one in which the product, however perfectly manufactured, incorporates or fails to incorporate a design feature with the result that injury is proximately caused thereby"; the supreme court reversed a verdict for the plaintiff and adopted the test set forth in *Barker v Lull Engineering Co, Inc,* 20 Cal 3d 413; 143 Cal Rptr 225; 573 P2d 443 [1978], which requires a judge to instruct the jury that a product is defective in design if it "fail[s] to perform as safely as an ordinary consumer would expect" *or* if *"the defendant* fails to prove . . . that on balance the benefits of the challenged design outweighed the risk of danger inherent in such design." *Beck, supra,* p 884 [emphasis added]); *Barker v Lull Engineering Co, Inc, supra* (see discussion under *Beck, supra); Suter v San Angelo Foundry & Machine Co,* 81 NJ 150; 406 A2d 140 (1979) (jury instructed that plaintiff required to prove "that the *product* had not been reasonably fit for the ordinary use for which it was intended," *id.,* p 168 [emphasis added]; the supreme court sustained the instruction, saying that "[t]he principle of strict liability, shift[s] the focus *from conduct,* as in negligence law generally, *to the product," id.,* p 169 [emphasis added]); *Micallef v Miehle Co,* 39 NY2d 376, 387; 348 NE2d 571; 384 NYS2d 115 (1976) (instructions on implied warranty action not stated in the opinion, but court states that "under a doctrine of strict products liability, the manufacturer of a *defective product* is liable to any person injured or damaged if the defect was a substantial factor in bringing about his injuries or damages," *id.,* p 387 [emphasis added]); *Wilson v Piper Aircraft Corp,* 282 Or 61; 577 P2d 1322 (1978) (instructions not reproduced; court held that, because there was insufficient evidence of a defect, the case should not have gone to jury; dictum, however, did emphasize the conduct of the manufacturer).

[13] *Ante,* p 686, citing Keeton, *Manufacturer's liability: The meaning of "defect" in the manufacture and design of products,* 20 Syracuse L R 559, 569-571 (1969).

[14] Keeton, fn 13 *supra,* p 571.

failing to protect against an unknowable risk, Keeton would nevertheless hold the manufacturer subject to liability for designing a defective *product.*

Professor Wade's position "has been characterized as a risk utility test with imputed knowledge of all risks 'knowable' at the time of manufacture or sale."[15] Although this approach considers manufacturer conduct, Wade's proffered jury instruction focuses on the product: "A *[product]* is not duly safe if it is so likely to be harmful to persons [or property] that a reasonable *[sic]* prudent manufacturer [supplier], who had actual knowledge of *its harmful character* would not place it on the market."[16] (Emphasis added.)

### III

Nor is it true that there is a basis for distinguishing between design defect and other products liability cases. Evidence of negligence is not more readily uncovered in design defect cases than in manufacturing defect cases. Professors Twerski and Weinstein observed that "[t]here is perhaps no issue more difficult for a plaintiff to litigate than what the state of knowledge should have been for a manufacturer with expertise in his field."[17]

In a manufacturing defect case, there may be documents, technical data, and expert witness testimony demonstrating that the manufacturer took all reasonable and, indeed, extraordinary precau-

---

[15] *Ante,* p 686 and fn 18.

[16] Wade, *On the nature of strict tort liability for products,* 44 Miss L J 825, 839-840 (1973).

[17] Twerski & Weinstein, *A critique of the uniform product liability law—A rush to judgment,* 28 Drake L R 221, 227 (1978-1979). See also Keeton, fn 13 *supra,* p 570; Keeton, *Product liability—Inadequacy of information,* 48 Tex L R 398, 407-409 (1970), and Keeton, *Product liability and the meaning of defect,* 5 St Mary's L J (1973).

tions to avoid manufacturing defects. Such a man-
ufacturer deserves no less protection than a manu-
facturer who used reasonable care in designing a
product which nevertheless was not reasonably fit.
If we are to return to an incentive-deterrence
model, there is arguably as much to be gained,
from a societal point of view, in extending that
concept to manufacturing defects.[18]

To be sure, a verdict that there is a design
defect may be seen as an indictment of an entire
product line. It does not follow that a jury verdict
holding against the manufacturer will result in
the public being deprived of the product; litigation
will have stretched out over years before such a
verdict is rendered and then there are appeals
and, as in this case, retrial and further appeals—
this action was commenced August 24, 1972,
twelve years ago. The likelihood is that, taking
into consideration what is learned in the litigation,
the manufacturer will, measuring risk-utility,
make such improvements in the product as it finds
desirable. It has not been shown that there is need

---

[18] Assuming that a negligence standard promotes safety more effec-
tively than a strict liability standard, today's decision might encour-
age manufacturers to pursue "fail-safe" designs at the expense of
quality control. Professors Twerski and Weinstein said:

"By imposing a strict liability standard for production defects and a
negligence standard for design defects, the UPLL aggravates an
already difficult situation. In the development of product safety, there
may be several ways to address a safety hazard. One way may be to
increase quality control to assure the integrity of a crucial part.
Another may be to design a back-up safety feature (a fail-safe compo-
nent). By deciding that construction defect cases are not defensible (in
that strict liability applies regardless of fault), and that design defect
cases are defensible (on negligence or risk-utility grounds), the UPLL
has made a conscious decision to favor the design alternative over
quality control. This may be a short-sighted approach. It is possible
that increased safety can be accomplished at a lower cost by raising
quality control standards rather than by designing a fail-safe system
that could engender other risks. The difficulty is that the litigation
categories have been created by lawyers. Engineers who must think
in functional terms may find the framework totally unsatisfactory."
Twerski, fn 17 *supra*, p 226.

for a lower standard for design defect cases than in manufacturing defect cases in order to protect either the "manufacturer's assets" or the public from being deprived of a product.[19]

## IV

Assuming, as the opinion of the Court states, that implicit in a jury verdict that a product was—applying the implied warranty standard—"defectively designed," is a determination that the manufacturer acted unreasonably in the design; the question of the reasonableness of the manufacturer's conduct and the reasonableness of the product, even in a design defect case, are not indistinguishable or identical.

The spectrum of what is reasonable is broad. If it were otherwise, all reasonable men and women would agree, and there would be nothing for jury assessment. Different juries looking at the same facts may reach different conclusions regarding what is reasonable and both verdicts may be unimpeachable. It is for this reason that the answer may depend on how the question is phrased.[20]

The opinion of the Court does not cite a single case where a jury was instructed as it would have juries instructed henceforth in this state. Cases

[19] Addressing the fourth and final "intrinsic fairness" argument, if a careful manufacturer is rewarded with lower insurance premiums based on his products liability experience, then without regard to whether there is a fault or a product defect system, that manufacturer will not bear the burden of paying for losses caused by a manufacturer with a less satisfactory product liability experience. To the extent that the argument incorporates the result of a lower fault standard in terms of fewer successful products liability actions, the argument begs the question whether there should be a lower standard.

[20] See *Smith v E R Squibb & Sons, Inc*, 405 Mich 79, 98-100; 273 NW2d 476 (1979) (LEVIN, J., *dissenting*).

cited by the Court[21] appear to recognize that the proper inquiry is whether the product is reasonably fit for its intended or foreseeable purposes.

While, as a matter of logic, a jury might not bring in a verdict both that the manufacturer had not breached its duty of reasonable care and that the design of the product was not reasonably safe for its reasonably foreseeable uses, it is not, as the opinion of the Court declares, "inconceivable" that a jury would do so. Experience has shown that juries do just that. They do find a manufacturer not at fault, but the product, nevertheless, defective. The form of the question often preordains and directs the answer.[22] The need or desirability of obviating juror confusion does not, we repeat, decide what is the correct form of the inquiry.

We would affirm the Court of Appeals.

KAVANAGH, J., concurred with LEVIN, J.

[21] See fn 12.

[22] Courts recognize that the lexicon appropriate for jury instruction may differ from the language of the evolvement of a rule of law. See *People v Woods,* 416 Mich 581, 626; 331 NW2d 707 (1982); *Holland v United States,* 348 US 121; 75 S Ct 127; 99 L Ed 150 (1954).