CACEVIC v SIMPLIMATIC ENGINEERING COMPANY (ON REMAND)

Docket No. 207154. Submitted June 1, 2001, at Detroit. Decided December 14, 2001, at 9:00 A.M.

Lena and Nuo Cacevic brought a products liability action in the Oakland Circuit Court against Simplimatic Engineering Company, seeking damages for injuries sustained by Lena while operating a palletizer machine manufactured by the defendant. The court, David F. Breck, J., entered a judgment of no cause of action consistent with the jury's verdict. The plaintiffs appealed, alleging errors in jury instructions regarding the alleged negligent design of the machine and in the admission of evidence. The Court of Appeals reversed the judgment and remanded the matter for a new trial. 241 Mich App 717 (2000). The Supreme Court, in lieu of granting leave to appeal, vacated footnote 2 of the Court of Appeals opinion and remanded the matter to the Court of Appeals to consider the defendant's argument that the judgment in its favor should be affirmed because the defendant was entitled to a directed verdict. 463 Mich 997 (2001).

On remand, the Court of Appeals *held*:

Reasonable jurors viewing the evidence in the light most favorable to the plaintiffs could have determined that the defendant was aware of the magnitude of the foreseeable risks associated with the palletizer machine. The evidence also indicated that an economical, reasonable, alternative safety device was available to the defendant at the time it designed and manufactured the machine. Therefore, there was sufficient evidence for a jury to determine that alternative safety devices were available to the defendant that would have effectively minimized the risk of injury to Lena Cacevic. The trial court correctly denied the defendant's motion for a directed verdict on the basis that the plaintiffs established a prima facie case of design defect.

Reversed and remanded.

PRODUCTS LIABILITY — DEFECTIVE DESIGN — SAFETY DEVICES.

A prima facie case that would overcome a defendant's motion for a directed verdict in a products liability action alleging defective design on the basis of the omission of a safety device requires a showing of the magnitude of the foreseeable risks, including the

likelihood of occurrence of the type of accident precipitating the need for the safety device and the severity of injuries sustained from such an accident, and a showing of alternative safety devices and whether those devices would have been effective as a reasonable means of minimizing the foreseeable risk of danger.

*Gregory Fisher Lord,* for the plaintiffs.

*Beach & Ager* (by *Eugene H. Beach, Jr.*), for the defendant.

ON REMAND

Before: JANSEN, P.J., and HOOD and WILDER, JJ.

WILDER, J. In this products liability case, we previously reversed a jury verdict of no cause of action and remanded for a new trial.[1] In lieu of granting leave to appeal, the Supreme Court vacated footnote 2 of our previous opinion and remanded to us so that we could consider "defendant's argument that the judgment in its favor should be affirmed because it was entitled to a directed verdict." *Cacevic v Simpl[i]matic Engineering Co*, 463 Mich 997 (2001).[2] After considering this issue, we again reverse and remand for a new trial.

---

[1] *Cacevic v Simplimatic Engineering Co*, 241 Mich App 717, 730-731; 617 NW2d 386 (2000).

[2] In our original opinion, we relied on *Beaudrie v Anchor Packing Co*, 231 Mich App 242, 254, n 6; 586 NW2d 96 (1998), and *Barnell v Taubman Co, Inc*, 203 Mich App 110, 123; 512 NW2d 13 (1993), to hold that defendant had not properly preserved for appellate review the trial court's denial of its motion for a directed verdict; therefore, we declined to consider the claim. However, the Supreme Court indicated that pursuant to *Middlebrooks v Wayne Co*, 446 Mich 151, 166, n 41; 521 NW2d 774 (1994), defendant was "not required to file a cross-appeal to advance arguments in support of a judgment on appeal that were rejected by the lower court." *Cacevic, supra,* 463 Mich 997.

## I. FACTS AND PROCEEDINGS

### As stated in our previous opinion:

Plaintiff Lena Cacevic worked as a palletizer operator at Johnson Controls' Novi plant. While working the night shift on September 3, 1993, Lena sustained serious injuries to her right hand and arm when she reached inside the palletizer[3]

---

[3]    Our previous opinion described the palletizer mechanism and operation as follows:

The product at issue in this case is a Simplimatic Model 40 palletizer, a large, two-story machine that stacks eight layers of empty, plastic, soft drink bottles on wooden pallets that are wrapped for delivery to major soft drink companies. The palletizer was originally built by defendant in 1984 and subsequently sold to Hoover Universal in Taylor, Michigan. In 1989, Johnson Controls bought Hoover's bottling operations and the palletizer was relocated to Johnson Controls' Novi Plant.

The palletizer consists of two levels and four major components: (1) an intake palletizer dispenser and conveyor, (2) a hoist or elevator, (3) an accumulator bed, and (4) an exit conveyor that releases the full pallets. The palletizing process begins with a wooden pallet being automatically placed on an intake conveyor and carried to the elevator shaft where it stops and waits for clearance to enter the elevator. Clearance is determined by photo cells that sense when full pallets exit the elevator and when empty pallets may enter. The empty pallet automatically moves forward into the elevator and is carried up about fifteen feet by hoist chains to the upper level where an accumulator bed gathers the bottles and then sweeps them onto the pallet. As each empty pallet is loaded with bottles into the elevator, another empty pallet enters the intake dispenser and is conveyed to the elevator where photo cells signal the machine to wait for the full pallet to leave the elevator before allowing the empty pallet to enter.

During normal use, the palletizer's operator stands on a platform at the upper level near the moving accumulator bed where bottles coming down the assembly line are released. When a certain number of bottles have been collected, the operator presses a button to load them all onto an empty pallet that has been carried to the top of the machine by the elevator. As each layer of bottles is loaded, the elevator moves down just enough so that the tops of the bottles are even with the accumulator bed. The operator then places a "tier sheet" on top of the bottles to form a "floor" on which the next layer is placed. The operator repeats this process until there are eight layers of bottles on the pallet. When the pallet is fully loaded,

machine to free a pallet that became stuck in the elevator component of the machine. Lena tried to clear the jam by inserting her right hand and arm under a mesh guard into the pallet infeed opening to reach for the empty pallet and remove it from the machine. As Lena did this, the elevator raised the pallet, striking her hand and arm.

Plaintiffs filed the instant action against defendant Simplimatic Engineering Company, the manufacturer of the palletizer machine, alleging that defendant negligently designed and manufactured the palletizer by failing to include adequate and proper safeguards, provide adequate and proper instructions, devices, or methods to operate the machine, and provide adequate and proper warning of both the inherently dangerous areas of the machine and the dangers in operating the machine. [*Cacevic v Simplimatic Engineering Co*, 241 Mich App 717, 718-719; 617 NW2d 386 (2000).]

While not mentioned in our previous opinion, we note that during plaintiffs' case in chief, Evido Edwards was called to testify. He testified that on the evening of Lena's injury, he was temporarily operating the palletizer for Lena while she was taking a break.[4] During this time, the machine jammed. Edwards also

the operator presses another button, lowering the elevator to ground level where the full pallet rests on a set of conveyor chains which slowly move the pallet out the discharge side of the elevator shaft. Once the full pallet is discharged, it is automatically transported to a wrapping area.

Most of the operation of the palletizer is automatic, but there are certain functions that an operator is required to perform to keep the machine running. Generally, an operator is only required at the upper level of the machine; however, on occasion, when a pellet gets jammed in the elevator, the operator or another employee must run down to the lower level to clear the jam before resuming normal operations. The palletizer is equipped with normal "on/off" controls, as well as three emergency stop buttons and a master electrical control panel with a lockable disconnect that completely isolates the machine from the electrical mains. [*Cacevic, supra*, 241 Mich App 719-721.]

[4] His primary assignment was as a sideall machine operator. A sideall machine forms twenty ounce plastic bottles out of test-tube-shaped mate-

testified that he observed Lena returning from her break and asked her to help him fix the problem. According to Edwards, he asked Lena to walk around to the back of the machine and push the empty pallet further into the elevator shaft so the elevator would take the pallet up and he could continue putting bottles on it. Edwards then testified that as soon as Lena reached inside the machine she dropped to her knees, at which time he ran over and observed a gash across the top of Lena's right arm and called management to the scene. Thereafter, Lena was transported to the hospital.

Lena testified that she had been trained on the palletizer within her first few days of employment and that even though she felt it was the most difficult job in the plant, by the time her ninety-day probationary period had ended, she was able to successfully operate the machine. She also testified that she had not been given any instructions or training on lockout procedures for the machine, nor had she been given an operator or maintenance manual to review. According to Lena, the only way she knew to turn off the machine was by pressing the green stop button, but that every time she used that button to shut off the machine, the line leader would yell at her and instruct her not to turn off the machine. In addition, Lena admitted that during the course of her training she had been advised to turn off the machine before entering the elevator shaft, but also testified that, despite this advice, the management at Johnson Controls discouraged turning off equipment to clear jams

rial and then sends the bottles through the labeler and up to the palletizer. There is no dispute that Edwards knew how to operate the palletizer.

because this would back up the production line. She also testified that she had observed her supervisor and other employees reach inside the palletizer to clear jams and that, as far as she was aware, this was the only method of remedying a jam. Further, Lena testified that that there was no warning label instructing her not to enter the elevator shaft.

Plaintiffs also called Linda Long, Dr. Robert Cunitz, and Paul Glasgow to testify regarding the design and safety features of the palletizer.

Long, a safety officer with the Department of Consumer and Industry Services testified that she conducted an investigation of the accident and, as a result of this investigation, she opined that the protective device, placed in front of the elevator opening, was inadequate to guard the area in which Lena placed her arm. In fact, according to Long, she believed that because of the size of the guard, instead of serving as protection, it actually created a hazardous condition. Long also testified that her investigation revealed that there was a workable, usable lockout device on the palletizer at the time of Lena's injury but that only the maintenance people, and not the machine operators, were instructed on how to use the lockout. Long further testified that because it was common for conveying systems to finish the last stroke of production by the machine's residual pressure, simply pressing the emergency stop button on the palletizer would not remove all the hazards associated with the machine. Finally, Long testified that the warning labels placed on the palletizer merely warned of potential hazards without removing any dangers and thus did not protect operators of the machine.

In addition, Dr. Cunitz, a human factor psychologist,[5] testified that after reviewing all the relevant testimony, documents, and exhibits in this case, he believed the palletizer machine, as designed by defendant, was unreasonably dangerous and defective and that such dangers and defects were a substantial cause of Lena's injuries. Specifically, Dr. Cunitz testified that the palletizer could not clear its own jams or pick up fallen bottles and that the human operator had to perform these tasks, a fact reasonably foreseeable to the manufacturer at the time the machine was designed. Because the human operator had to clear jams and remove fallen bottles, it was necessary for the operator to be exposed to a "pinch-point hazard" during the normal use of the machine. Dr. Cunitz described this pinch-point hazard as the approximate six-inch opening above the wooden pallet that "closes rapidly as the hoist raises the pallet up." Dr. Cunitz testified that it was reasonably foreseeable that because the pinch point was essentially unguarded and easily reachable by somebody trying to clear a jam or retrieve a fallen bottle, the machine was unreasonably dangerous. He also testified that the warning label[6] on the machine was inadequate and that, because of the potential for permanent injury or death associated with the machine, there should have been a "danger" sign.

---

[5] A human factor psychologist is a specialty area within the field of psychology, concerning itself with human interactions with products. Dr. Cunitz focused his work on safety-related issues in the workplace, i.e., reviewing injuries and deaths associated with the use of various products and assessing how such injuries could be prevented.

[6] The warning label read:

   Caution. This machine starts automatically. Must turn off main electrical switch and air supply before performing any work.

Dr. Cunitz also opined that Lena's conduct in assisting Edwards on the night in question was reasonable and that her actions of reaching inside the machine to clear a pallet jam was foreseeable to the manufacturer at the time the machine was designed and manufactured. Specifically, Dr. Cunitz testified that the existence of the small mesh guard placed in front of the pinch point established that defendant was cognizant of the danger associated with the pinch point. With respect to this guard, Dr. Cunitz testified that because of its size it was inadequate protection, noting that an employee could easily reach around the guard. Instead, Dr. Cunitz testified that the Plexiglass guard that had been placed on the machine after Lena's injury was in a much better position to protect the operators and would have, in his opinion, prevented Lena's injuries.

Glasgow, a safety and design engineer, as well as president and chief operating officer of Glasgow Products, Inc., also corroborated the testimony of Long and Dr. Cunitz. He testified that the mesh guard provided by defendant was "totally inadequate" because it did not conform to the safe distance aspect of guarding, meaning that the guard was not positioned in such a way that it would prevent a person from placing a hand through the opening into the hazardous area of the palletizer. On the basis of his examination of the equipment, Glasgow testified that because there was no adequate, protective guarding in place when Lena's accident occurred, the palletizer did not conform to the American National Standards Institute Committee (ANSI) standards for guarding that existed at the time the palletizer was designed and that defendant did not use reasonable and diligent

care to eliminate a reasonably foreseeable risk of harm (i.e., injuring a hand while trying to clear a jam). He also noted during his testimony that at the time of his investigation, the original mesh guard had been replaced with a Plexiglass guard with an interlock switch, so that, if the guard was opened, the palletizer would automatically stop operating. According to Glasgow, the interlock switch was a standard design procedure used in most machinery to prevent injuries from foreseeable dangerous conditions and that this procedure had been known and used long before the palletizer was designed and manufactured by defendant.[7] Hence, he concluded that the palletizer was negligently designed and manufactured.

Plaintiffs also called Paul Smith, defendant's manager of machinery engineering. He testified that he had observed the Plexiglass guard installed after Lena's injury and admitted that it was both economically and technically feasible to install this guard on the palletizer at the time of design and manufacture. Specifically, he indicated that the Plexiglass guard could have been installed on the machine for a cost of less than $1,000 and that the palletizer sold for $64,000.[8]

At the close of plaintiffs' case, defendant moved for a directed verdict, arguing that plaintiffs had not shown that the design of the machine was the proximate cause of Lena's injuries and therefore plaintiffs failed to establish a prima facie case of design defect liability. Alternatively, defendant argued that the open

---

[7] Dr. Cunitz also testified that the Plexiglass guard was equipped with an interlock switch.

[8] Smith also testified that the entire system would have sold for about $152,000.

and obvious danger rule proscribes plaintiffs from recovering in the instant case. In denying defendant's motion based on these two issues, the trial court stated:

> I'm going to find that looking at the evidence in a light most favorable to the Plaintiff having to do with the lack of proximate cause issue that—and the evidence in the light favorable to the Plaintiff, I'll deny that portion of your motion.
>
> On the open and obvious argument, also for the same reason, I'll deny that.

Defendant also sought a directed verdict on the basis of plaintiffs' inability to establish an unreasonable risk associated with the palletizer. Again, the trial court denied the motion on this ground because it found that, viewing the evidence in the light most favorable to the plaintiffs, there was evidence presented sufficient to allow a jury to find that the risk associated with the palletizer was unreasonable.

## II. STANDARD OF REVIEW

This Court reviews de novo the grant or denial of a directed verdict. *Meagher v Wayne State Univ*, 222 Mich App 700, 708; 565 NW2d 401 (1997). In reviewing the trial court's decision, we view the evidence presented up to the time of the motion in the light most favorable to the nonmoving party, granting that party every reasonable inference, and resolving any conflict in the evidence in that party's favor to decide whether a question of fact existed. *Thomas v McGinnis*, 239 Mich App 636, 643-644; 609 NW2d 222 (2000). A directed verdict is appropriately granted only when no factual questions exist on which reasonable jurors

could differ. *Meagher, supra* at 708. If reasonable jurors could reach conclusions different than this Court, then this Court's judgment should not be substituted for the judgment of the jury. *Wickens v Oakwood Healthcare System*, 242 Mich App 385, 389; 619 NW2d 7 (2000).

### III. ANALYSIS

"A manufacturer has a duty to 'eliminate any unreasonable risk of foreseeable injury.' " *Bazinau v Mackinac Island Carriage Tours*, 233 Mich App 743, 757; 593 NW2d 219 (1999), quoting *Prentis v Yale Mfg Co*, 421 Mich 670, 693; 365 NW2d 176 (1984). See also *Mallard v Hoffinger Industries, Inc (On Remand)*, 222 Mich App 137, 141; 564 NW2d 74 (1997), and *Ghrist v Chrysler Corp*, 451 Mich 242, 248; 547 NW2d 272 (1996). In addition,

> "[a] prima facie case of a design defect premised upon the omission of a safety device requires first a showing of the magnitude of *foreseeable risks*, including the likelihood of occurrence of the type of accident precipitating the need for the safety device and the severity of injuries sustainable from such an accident. It secondly requires a showing of alternative safety devices and whether those devices would have been effective as a reasonable means of minimizing the foreseeable risk of danger. This latter showing may entail an evaluation of the alternative design in terms of its additional utility as a safety measure and its trade-offs against the costs and effective use of the product." [*Bazinau, supra* at 757-758, quoting *Reeves v Cincinnati, Inc*, 176 Mich App 181, 187-188; 439 NW2d 326 (1989) (emphasis added in *Bazinau*).]

See also *Prentis, supra* at 687, n 24; *Owens v Allis-Chalmers Corp,* 414 Mich 413, 418; 326 NW2d 372 (1982).

In the instant case, we note that Dr. Cunitz testified that the palletizer, as designed, was unable to clear its own jams or pick up fallen bottles and that therefore it was the responsibility of the operator to complete these tasks. He also testified that because an operator would have to place hands in the machine in order to clear a jam—coming into contact with the "pinchpoint" hazard—it was reasonably foreseeable that somebody trying to clear a jam or retrieve a fallen bottle could potentially suffer a permanent injury or death. Further, Dr. Cunitz testified that because defendant had placed a mesh guard on the machine, albeit an ineffective one, defendant was cognizant of the magnitude of this risk. Glascow's testimony corroborated that of Dr. Cunitz, because Glasgow testified, among other things, that the mesh guard was "totally inadequate," that the palletizer violated ANSI standards, and that defendant did not use reasonable and diligent care to eliminate a reasonably foreseeable risk of harm. Similarly, Long testified with regard to the inadequacy of the guard designed by defendant. Viewing this testimony in the light most favorable to the plaintiffs, *Thomas, supra,* it is apparent that reasonable jurors could have determined that defendant was aware of the magnitude of foreseeable risks associated with the palletizer. *Wickens, supra; Bazinau, supra.*

Additionally, Dr. Cunitz testified that an alternative Plexiglass guard had been installed on the palletizer after Lena's injury and that this guard would have prevented Lena's injuries. This, coupled with Glasgow's

testimony that an interlock switch had been added to the palletizer, indicated that there were alternative safety devices available to defendant at the time of manufacture that would have effectively prevented Lena's injury. Further, Smith testified that the Plexiglass guard was both economically and technically feasible at the time of design. This evidence established that an economical, reasonable, alternative safety device was available to defendant at the time it designed and manufactured the palletizer. Therefore, when viewed in the light most favorable to plaintiffs, this evidence was sufficient for a jury to determine that alternative safety devices were available to defendant that would have effectively minimized the risk of injury to Lena. *Thomas, supra; Bazinau, supra.*

Because plaintiffs established the magnitude of foreseeable risks and that the alternative safety device was economically feasible and effective in minimizing the risk of injury, plaintiffs established a prima facie case of design defect. Thus, the trial court correctly denied defendant's motion for a directed verdict.[9]

---

[9] With regard to defendant's open and obvious danger argument in the trial court, our previous opinion stated that because "we find no legal authority to support defendant's position that the open and obvious danger doctrine should be extended to cases alleging design defects involving nonsimple products, the doctrine is inapplicable in this case." *Cacevic, supra,* 241 Mich App 729. See also *id.* at 725, 729, n 1. This holding was not disturbed by the Supreme Court's remand order. *Cacevic, supra,* 463 Mich 997. Accordingly, we find our previous opinion to be controlling and conclude that because the open and obvious danger doctrine does not apply in design defect cases, *Cacevic, supra,* 241 Mich App 725, the trial court correctly denied defendant's directed verdict motion based on the open and obvious danger doctrine.

IV. CONCLUSION

In sum, we conclude that the trial court correctly denied defendant's motion for a directed verdict. Because we find that defendant was not entitled to a directed verdict, the jury's judgment in its favor was not harmless. Therefore, we again find it necessary to reverse the judgment in favor of defendant and remand for a new trial.

Reversed and remanded for further proceedings consistent with this opinion and our previous opinion, *Cacevic, supra*, 241 Mich App 717. We do not retain jurisdiction.