WEAVER, J.
(concurring in part and dissenting in part). I concur in the majority’s conclusions that the trial court’s ruling on the defendants’ motion in limine was not an abuse of discretion and that its decision to exclude the evidence of defendant Daniel Bennett’s expunged conviction should therefore be affirmed. But I write separately because I respectfully dissent both from the majority’s conclusion that Michigan’s Civil Rights Act (CRA), MCL 37.2101 et seq., provides for individual liability against an agent of an employer and from its conclusion that defendant Ford Motor Com *435 pany was entitled to a directed verdict because plaintiff failed to establish that Ford had notice of the sexual harassment.
Instead, I would conclude that the Legislature included the word “agent” in the definition of “employer” in MCL 37.2201(a) to denote respondeat superior liability, not individual liability. Accordingly, I would not overrule Jager v Nationwide Truck Brokers, Inc, 252 Mich App 464; 652 NW2d 503 (2002), and I would affirm the Court of Appeals conclusion in this case that there is no individual liability under the statute. Further, I would conclude that plaintiff offered sufficient evidence during trial to allow the question of notice to go to the jury. Therefore, I would reverse the Court of Appeals decision that the trial court properly granted a directed verdict in Ford’s favor because plaintiff failed to show that she provided notice of her sexual harassment claim.
i
The CRA provides, in pertinent part, that “[a]n employer shall not do any of the following”:
(a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status.
(b) Limit, segregate, or classify an employee or applicant for employment in a way that deprives or tends to deprive the employee or applicant of an employment opportunity, or otherwise adversely affects the status of an employee or applicant because of religion, race, color, national origin, age, sex, height, weight, or marital status.
(c) Segregate, classify, or otherwise discriminate against a person on the basis of sex with respect to a term, *436 condition, or privilege of employment, including, but not limited to, a benefit plan or system. [MCL 37.2202.]
The CRA defines discrimination because of sex to include sexual harassment. MCL 37.2103(i). It defines “sexual harassment” to mean “unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature under the following conditions”:
(i) Submission to the conduct or communication is made a term or condition either explicitly or implicitly to obtain employment, public accommodations or public services, education, or housing.
(ii) Submission to or rejection of the conduct or communication by an individual is used as a factor in decisions affecting the individual’s employment, public accommodations or public services, education, or housing.
(iii) The conduct or communication has the purpose or effect of substantially interfering with an individual’s employment, public accommodations or public services, education, or housing, or creating an intimidating, hostile, or offensive employment, public accommodations, public services, educational, or housing environment. [MCL 37.2103Ü).]
The term “employer” is defined as “a person who has 1 or more employees, and includes an agent of that person.” MCL 37.2201(a).
The majority concludes that because the definition of the word “employer” includes an “agent” of the employer, “an agent can be held individually liable under the CRA.” Ante at 422. I disagree and, instead, agree with the conclusion reached by the Court of Appeals in Jager, supra at 484, that by defining “employer” to include an “agent” of the employer, the Legislature “meant merely to denote respondeat supe *437 rior liability[1] rather than individual liability.”[2] Thus, I would not overrule the Jager decision.
Had the Legislature intended the CRA to impose liability on the individuals who commit harassment, it would likely have done so in a more straightforward manner than by defining “employer” to include an “agent” of the employer.[3] Relying on the word “agent” to impose individual liability would, under the majority’s interpretation, only allow individual liability against supervisors and others in similar positions who, under agency law, might be considered “agents” of the employer.[4] But it would not permit coemployees who harass a victim to be held individually liable. If the Legislature truly intended to impose individual liability under the CRA on those who commit sexual harassment, one would expect that it would choose language that would allow all individuals who commit the harassment to be held liable, regardless of their status as a supervisor or coemployee.
Further, the “round-aboutness” of the majority’s *438 approach becomes more evident when one realizes that recognizing individual liability under the CRA may be a very shallow “victory” for plaintiff and may actually result in very few individuals being held liable. In this case, the majority assumes that Mr. Bennett was an “agent” of Ford without analyzing the issue. But if the issue whether the perpetrator of the harassment was an agent of the employer were analyzed under strict agency principles, in many cases, it may be concluded that the perpetrator of the harassment cannot be held individually liable as an agent because the perpetrator did not have actual or apparent authority from the employer to harass employees of the employer; therefore he cannot be considered an “agent” of the employer because he was acting outside the scope of his authority.[5] It does not seem reasonable that the Legislature would create individual liability using language that might, in actuality, foreclose most individuals from being held individually liable under the CRA.
The majority offers no clear reason for rejecting the conclusion that the phrase “agent of the employer” denotes respondeat superior liability. Rather, it simply concludes that the phrase “includes an agent of that person” must mean “if the words are going to be read sensibly” that agents are subject to individual liability *439 under the statute. Ante at 420. Thus, the majority’s reasoning amounts to little more than it must mean this because we say it does. But, as suggested above, rather than a “sensible” reading of the statute, this seems a very round-about way to create individual liability.
I also disagree with the majority’s suggestion that concluding that the word “agent” denotes respondeat superior liability and not individual liability places “policy” over the “text” of the statute. Ante at 421-422. Interpreting the text of the statute does not mean that we read a phrase in the statute in isolation from the act as a whole or from the purpose of the act. Interpreting a statute with judicial restraint and common sense may, in fact, require us to consider the act as a whole and its purpose while we endeavor to understand what the Legislature intended by including a particular phrase.
In this case, a purpose of MCL 37.2202 is to prohibit employers from sexually discriminating against employees. By imposing liability on employers for sexual harassment, employers will be encouraged to take steps to prevent sexual harassment from occurring in the workplace. But often in a large company or corporation, there is not one “person” that could be considered the “employer” for purposes of determining whether an “employer” discriminated against an employee. The employer is an entity. Thus, it is reasonable for the Legislature to include in the definition that an “employer” includes an “agent.” Including this respondeat superior aspect in the statute ensures that employees can hold employers liable for harassment while still balancing the interests of the employer by hmiting employer liability to those who can be considered the employer’s “agents” and incorporating respondeat superior principles that require notice to the employer of the *440 alleged harassment.[6] Considering this “policy” behind the provision does not place policy over “text.” Rather, it is another way a judge exercises common sense and judicial restraint while attempting to reach a reasonable interpretation of what the Legislature intended the words to mean.
Therefore, until the Legislature clearly creates individual liability under the statute, I would conclude that plaintiff does not have a cause of action against Mr. Bennett under the CRA.[7]
ii
The majority also concludes that the trial court properly granted a directed verdict in favor of defendant Ford Motor Company because plaintiff failed to establish that Ford had notice of the harassment. I disagree and would allow the jury to determine, under the totality of the circumstances, whether Ford had notice of the alleged sexual harassment.
The elements required to establish a prima facie case of sexual harassment based on hostile work environment are:
(1) the employee belonged to a protected group;
(2) the employee was subjected to communication or conduct on the basis of sex;
*441 (3) the employee was subjected to unwelcome sexual conduct or communication;
(4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee’s employment or created an intimidating, hostile, or offensive work environment; and
(5) respondeat superior. [Radtke v Everett, 442 Mich 368, 382-383; 501 NW2d 155 (1993).]
As further explained, under the fifth element, an employer may avoid liability if, upon notice of the hostile work environment, it adequately investigated and took prompt remedial action. Id. at 396 (quoting Downer v Detroit Receiving Hosp, 191 Mich App 232, 234; 477 NW2d 146 [1991]). An employer must have notice of the alleged harassment before it can be held liable, and it does not have a duty to investigate and take prompt remedial action until it has actual or constructive notice. Radtke, supra at 396-397 and n 44.
In this case, the trial court granted a directed verdict in Ford’s favor on plaintiffs hostile work environment claim on the basis that there was no notice to Ford.[8] The trial court stated:
The fact of the matter is that there was no notice to Ford. This 1998 letter to Mr. Rush, if it went to him, from the son-in-law, the defendant never made mention of any sexual harassment. And again, the only people she told were supervisors. Under normal circumstances I would agree that that would be enough. But in this case it was told to them in confidence. She asked them not to repeat it. And again, she complained that she couldn’t come forward because of her culture.
The Court of Appeals affirmed the trial court’s ruling.
*442 This Court reviews de novo the grant of a motion for a directed verdict. Cacevic v Simplimatic Engineering Co (On Remand), 248 Mich App 670, 679; 645 NW2d 287 (2001); see also Craig v Oakwood Hosp, 471 Mich 67, 77; 684 NW2d 296 (2004) (stating that a decision on a motion for judgment notwithstanding the verdict is reviewed de novo). In reviewing the trial court’s decision on the motion, “we examine the evidence and all reasonable inferences that may be drawn from it in the light most favorable to the nonmoving party.” Hord v Environmental Research Institute of Michigan (After Remand), 463 Mich 399, 410; 617 NW2d 543 (2000). “A directed verdict is appropriately granted only when no factual questions exist on which reasonable jurors could differ.” Cacevic, supra at 679-680; see also Wilkinson v Lee, 463 Mich 388, 391; 617 NW2d 305 (2000) (stating that a directed verdict is appropriate only if the evidence, when considered in the light most favorable to the nonmoving party, fails to establish a claim as a matter of law). Thus, while not insurmountable, the threshold for obtaining a directed verdict is high. Hord, supra at 410.
In my opinion, considering all the evidence and the reasonable inferences that may be drawn from it, there are factual questions about which reasonable jurors could differ regarding whether Ford had notice. Therefore, the issue of notice is not one that the trial court can properly decide as a matter of law; instead, it is a question of fact to be decided by the jury. Consequently, I would reverse the Court of Appeals affirmance of the trial court’s grant of a directed verdict in Ford’s favor and remand this case to the trial court.
Plaintiff testified that in 1995, she told her supervisor, Gary Zuback, that Mr. Bennett had been sexually harassing her. She also testified that around the same *443 time, she told another supervisor, Butch Vaubel, who said that he would talk to Mr. Bennett, and that on different occasions, she told her coworkers.Dan Welch, Dave Perry, and Brad Goatee. She admitted that when she told Mr. Zuback and Mr. Vaubel, she told them confidentially. Dan Welch testified that he did not tell anyone about the first incident of harassment that plaintiff described to him, but that he later spoke to Jerome Rush, the supervisor of labor relations, in October 1998, as well as Ron Mester and perhaps Richard Greenfield about the situation. Mr. Goatee testified that he was called down to labor relations in 1996 or 1997 to discuss Mr. Bennett. Mr. Rush testified that before plaintiffs lawsuit was filed, Mr. Bennett told him that plaintiff was trying to set Mr. Bennett up on a sexual harassment claim and that Ford, therefore, knew about the lawsuit before it was filed.
Labor relations notes written by Pete Foley to Jerome Rush on August 25, 1998, indicate that plaintiff was very upset and felt that Mr. Bennett and another worker, Tammy Holcomb, were looking at her and laughing. Notes dated August 28, 1998, state the plaintiff told Pete Foley that Mr. Bennett came near her when no one was around and that she was scared. Notes from Jerome Rush dated September 30, 1998, stated that plaintiff told him that Mr. Bennett was “harassing” her.
Letters from plaintiffs treating psychologist, Fran Parker, on September 19,1997, and November 10,1997, reference plaintiffs discomfort with Mr. Bennett, A letter sent by plaintiffs son-in-law, Paul Lulgjuraj, who is an attorney, on April 9, 1998, to Mr. Rush states that his office was investigating “ongoing acts of discrimination and retaliation,” references threats made by Tammy Holcomb, and advises that his office may be *444 taking actions “to insure that our client is not subjected to working in a hostile environment.” On December 17, 1998, Dr. Parker wrote to Mr. Rush to explain that Rush had misunderstood Parker’s phone call on October 6, 1998, to Rush to tell Rush that plaintiff had homicidal and suicidal thoughts. Parker’s letter stated that Parker did not tell Mr. Rush that plaintiff intended to kill Dan Bennett, but that the call was meant to ask Mr. Rush to intervene on plaintiff’s behalf because the stress of plaintiffs job was “breaking her down.”
The majority, in affirming the trial court’s grant of a directed verdict in Ford’s favor, improperly creates a rule of automatic waiver. Under the majority’s analysis, any time an employee requests confidentiality when reporting sexual harassment, the employee will have waived notice. Ante at 427-428. While a request of confidentiality is certainly something that the jury should consider in determining whether the employer had notice, such a request should not constitute an automatic waiver of notice. Rather, all the evidence presented and the totality of the circumstances must be considered when determining whether the employer had actual or constructive notice. See, e.g., Meritor Savings Bank, FSB v Vinson, 477 US 57, 72; 106 S Ct 2399; 91 L Ed 2d 49 (1986), where in rejecting a rule of automatic liability for employers for sexual harassment by supervisors, the United States Supreme Court also stated that the “absence of notice to an employer does not necessarily insulate that employer from liability.”
Considering all the evidence presented in this case in the light most favorable to the plaintiff, there are issues of fact to be decided by the jury about whether defendant Ford Motor Company had notice that plaintiff was being sexually harassed. While it is true that plaintiff may have requested confidentiality from her supervi *445 sors and that many of the letters and documents mentioning “harassment” generally do not detail the specific instances of sexual harassment on which plaintiffs lawsuit is based, evidence was also presented that she told coworkers of the harassment and that the coworkers in turn spoke with employees in the labor relations department. Further, considering all the documentation in the light most favorable to plaintiff, there is certainly evidence that plaintiff complained to Ford that Mr. Bennett was “harassing” her and doing something to make her job very stressful.
Therefore, I would conclude that the question of notice is not one that can be decided as a matter of law by the trial court, but one that must be decided by the jury after it considers the entire record and weighs the conflicting evidence.

1 Respondeat superior “means that a master is hable in certain cases for the wrongful acts of his servant, and a principal for those of his agent.” Black’s Law Dictionary (6th ed). It is an element of a prima facie case of sexual harassment based on hostile work environment. Radtke v Everett, 442 Mich 368, 383; 501 NW2d 155 (1993). For all five elements, see pp 440-441 of this opinion.

 See also Miller v Maxwell’s Int’l Inc, 991 F2d 583 (CA 9, 1993), and Wathen v Gen Electric Co, 115 F3d 400 (CA 6, 1997), which interpret the phrase as used in Title VII.

 For example, the Legislature could have said in MCL 37.2202 that an “employer or employee of the employer shah not. ..,” or it could have included a separate section in the statute addressing individual liability.

 An agent has been defined as a “person authorized by another (principal) to act for or in place of him; one intrusted with another’s business” or “[o]ne who deals not only with things, as does a servant, but with persons, using his own discretion as to means, and frequently establishing contractual relations between his principal and third persons.” Black’s Law Dictionary (6th ed).

 See, e.g., AMCO Builders & Developers, Inc v Team Ace Joint Venture, 469 Mich 90, 103-104; 666 NW2d 623 (2003) (Young, J., concurring) (stating that agency principles are applicable to the attorney-client relationship and that a client may be bound by the acts of his agent when the agent is acting within the scope of his authority); James v Alberts, 464 Mich 12, 15; 626 NW2d 158 (2001) (noting that “a principal is hound by an agent’s actions within the agent’s actual or apparent authority”).
In light of this, I now question the correctness of our decision in Chambers v Trettco, Inc, 463 Mich 297, 312, 316; 614 NW2d 910 (2000), which concluded that the CRA is firmly “rooted in traditional agency principles.” While agency principles may be a helpful guide in applying the CRA, I question whether they should he rigidly applied in this setting.

 As noted in footnote 5 of this opinion, I question whether agency principles should be rigidly applied to the CRA rather than used as a general guideline for interpreting the CRA, and I do not mean to suggest that by using the word “agent” to denote respondeat superior liability, the Legislature clearly intended to incorporate any and all principles of agency law into the CRA.

 I note that although I would conclude that plaintiff does not have a claim against Mr. Bennett under the CRA, she can pursue any traditional tort claims that she may have against him.

 Defendant Ford moved for summary disposition of plaintiffs hostile work environment claim only on the issue of notice.