NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0173n.06

No. 13-1417

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Mar 03, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| SANDRA D. PAUL, Personal Representative of the Estate of Jay Curtis Paul, Deceased, | ) ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | |
| HENRI-LINÉ MACHINE TOOLS, INC., | ) ) | |
| Defendant-Appellee. | ) | |

Before:  BOGGS, NORRIS, and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.**  In this tragic workplace-death case, Sandra Paul, personal representative of her husband's estate, appeals the district court's grant of summary judgment to Defendant Henri-Liné Machine Tools (HLMT), the manufacturer and seller of the milling machine her husband was operating when he was mortally injured. For the reasons stated below, we AFFIRM.

**I.**

In February 1999, Lincoln Park Boring, a machining company in Michigan, contracted HLMT to design, manufacture, and install a custom overhead-gantry milling machine at a cost of $ 2.5 million.  HLMT installed the machine at Lincoln Park Boring in 2001 and trained Lincoln Park Boring's head machine-tool operator, Frank Shafer, to operate it.  Plaintiff's decedent, Jay Paul (Paul), began employment at Lincoln Park Boring in 2002

1

and Shafer trained him to operate the machine. Paul was Lincoln Park Boring's lead machinist and the day-shift operator of the Henri-Liné machine. Paul had twenty years of machining experience when this accident occurred on July 30, 2008. Additional pertinent background is taken from the district court's order granting summary judgment:

> The overhead gantry milling machine is a large, complex machine with computerized numeric controls [CNC] that is designed to cut metal . . . .
>
> The work area of the machine is a flat, rectangular bed that is approximately 50 feet long and 15 feet wide and level with the floor of the shop. The work piece remains at rest on the bed of the machine while the cutting tool of the machine travels around the stationary piece. An overhead gantry milling machine is characterized by a large, metal cross-rail that is attached to two vertical columns, which are located on either side of the machine bed. This entire assembly ("the gantry") travels as a unit up and down the length of the work area ("the x-axis"). Attached to the crossrail is a vertical spindle which houses the cutting tool. This spindle travels back and forth along the crossrail, allowing access to the entire width of the bed of the machine ("the y-axis"). The spindle also raises and lowers the cutting head vertically to different heights above the platform bed ("the z-axis"). Thus, through the movement of the gantry and the spindle, the cutting head is able to travel in all three dimensions and access any area on or above the bed of the machine.
>
> This machine is used by Lincoln Park Boring to create one-of-a-kind machine parts. Every part is a different size and shape and some of them fill the entire work space or even extend off the bed. The part that was being utilized [sic] at the time of the accident was 14.5 wide by 50 feet long. . . . The flexibility to machine different sizes and shapes of metal is a key attribute of the overhead gantry milling machine.
>
> The machine's operation is controlled from a platform that is permanently attached to the gantry in order to provide [the operator] a close view of the spindle and the cutting process. Once the machine is programmed and the program is started, the machine continues to operate even if the operator leaves the control station on the operator's platform. There is no guard or other barrier to prevent the operator from entering the work area during its operation.

2

This particular machine is frequently operated on a twenty-four hour basis. Operators often must exit the platform during operation in order to perform such tasks as preparing tools, cleaning the floor, preparing materials for the next part, removing metal chips created by the cutting tool, inspecting the work piece, verifying that the machine is cutting correctly, or applying lubricant to the cut. An air hose with an attachment approximately eighteen inches long permitted operators to maintain some distance between themselves and the cutting tool when blowing metal chips away from the point of the cut.

. . . .

In this case, there were no known witnesses to the accident, and its cause is unknown. It was determined that the machine was in automatic mode when Jay Curtis Paul left the platform and entered [the] work area. The parties have speculated that he may have been blowing metal chips off of the work piece at the time of the accident. Apparently, while he was on the bed of the machine near the work piece, the cutting tool traveled directly over his head and then, in order to continue its programmed cuts, descended, cutting into his shoulder. It is not clear why he permitted the cutting tool to get so close to him. This particular machine moves at a maximum speed of approximately one-half mile per hour, which is considered low-speed. The average person walks more than five times faster than the machine's highest speed. Aside from being slow, the machine is also quite visible and noisy when it is moving. [The President of Lincoln Park Boring, Richard] Yesue testified that (1) Jay Curtis Paul knew that one should never allow himself to come between the cutter and the work piece and (2) nobody was able to deduce an explanation for the accident that made sense to him. The Plaintiff speculates that her husband may have thought that he had programmed a pause in the code that would stop the cutting tool at the point directly above him.

On July 30, 2008, the accident was investigated by the Michigan Occupational Safety & Health Administration ("MIOSHA"). After its investigation, MIOSHA declined to issue a citation to Lincoln Park Boring. Although the MIOSHA report indicated that the machine was adequately guarded, it also appeared to indicate that the operator should not be able to physically interpose himself between the cutting head and the work piece. The report did not make any recommendations regarding additional guards to place on the machine.

*Paul v. Henri-Line Machine Tools, Inc.*, 938 F. Supp. 2d 691, 694–95 (E.D. Mich. 2013).

In March 2010, Plaintiff filed this action alleging negligence (defective design and failure to warn and instruct), gross-negligence, and breach-of-warranty claims. HLMT moved for summary judgment in December 2011. The district court granted HLMT's motion in March 2013. Plaintiff timely appealed.

## II.

We review de novo the district court's grant of summary judgment, determining "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 526 (6th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). Michigan law governs substantive issues in this diversity suit. *See Swix v. Daisy Mfg. Co., Inc.*, 373 F.3d 678, 681 (6th Cir. 2004).

### A. DEFECTIVE DESIGN CLAIM

**Risk-Utility Balancing Test**

> To prove a design defect under Michigan law, a plaintiff must show that the product was "not reasonably safe for its foreseeable uses" and that a "risk-utility analysis" favored a safer design. Under this approach, a plaintiff must show that (1) the product was not reasonably safe when it left the control of the manufacturer; and (2) a "feasible alternative production practice was available that would have prevented the harm without significantly impairing the usefulness or desirability of the product to users." MCL 600.2946(2); *see also Gregory* [*v. Cincinnati Inc.*, 450 Mich. 1], 11, 538 N.W.2d at 329 [(1995)]. Plaintiffs may use both direct and circumstantial evidence to prove a design defect claim.

*Croskey v. BMW of N. Am., Inc.*, 532 F.3d 511, 515–16 (6th Cir. 2008) (applying Michigan law). Under Michigan law, whether an alleged design defect is actionable in negligence is decided under a risk-utility balancing test. *See Prentis v. Yale Mfg. Co.*, 365 N.W.2d 176,

4

185–86 (Mich. 1984) (adopting "a pure negligence, risk-utility test in products liability actions against manufacturers of products, where liability is predicated upon defective design."). A plaintiff establishes a prima facie case of design defect under this balancing test by demonstrating:

> 1) that the severity of the injury was foreseeable by the manufacturer; 2) that the likelihood of occurrence of [his] injury was foreseeable by the manufacturer at the time of distribution of the product; 3) that there was a reasonable alternative design available; 4) that the available alternative design was practicable; 5) that the available and practicable reasonable alternative design would have reduced the foreseeable risk of harm posed by the product; and 6) that omission of the available and practicable reasonable alternative design rendered defendant's product not reasonably safe.

*Peck v. Bridgeport Machs., Inc.*, 237 F.3d 614, 617–18 (6th Cir. 2001) (applying Michigan law); *see also Cacevic v. Simplimatic Eng'g Co.*, 645 N.W.2d 287, 293 (Mich. Ct. App. 2001). The prima facie case requires "proof sufficient for a reasonable jury to balance the magnitude of the risk versus the feasibility of other design alternatives, or otherwise to weigh the unreasonableness of risks arising from the design chosen." *Miller v. Ingersoll-Rand Co.*, 148 F. App'x 420, 423 (6th Cir. 2005) (applying Michigan law) (internal quotation marks and citations omitted).

### 1.

Because the district court granted summary judgment on the basis that Plaintiff failed to establish the second element of the risk-utility balancing test, that is the only issue before us.

The district court concluded that Plaintiff presented insufficient evidence to establish that the likelihood of occurrence of the injury was foreseeable to HLMT at the time it manufactured the custom overhead-gantry milling machine for Lincoln Park Boring, citing

5

Plaintiff's experts' testimony that they were unable to quantify the probability of a similar accident occurring and Plaintiff's failure to produce either statistical evidence to demonstrate the likelihood of an injury, or evidence of similar prior accidents, or evidence that overhead-gantry milling machines were widely known to cause serious injuries:

> Paul has demonstrated [the first element of the risk-utility balancing test:] that an operator injury was foreseeable to Henri-Liné Tools. Evidence was produced that an operator must regularly enter the work area while the machine is in use. An employee for Henri-Liné Tools testified that at the time the Lincoln Boring machine was designed, the Company considered implementing safety measures for operators who must venture onto the machine bed but it deemed the addition of barriers to be impractical. Paul's experts testified that the need for operator's [sic] to enter the work area created the possibility of injury. Thus, she has produced sufficient factual evidence to indicate that the possibility of injury was foreseeable.

> However, she has not produced any statistical evidence to demonstrate the [second element—] likelihood of an injury resulting from use of the machine. The fact that a machine is dangerous *per se* is an insufficient basis to demonstrate the likelihood of an injury. *Gregory v. Cincinnati Inc.*, No. 198382, 1999 WL 33453911 (Mich. Ct. App. Feb. 23, 1999) ("[E]vidence showing merely that there was a risk of harm is insufficient to meet the plaintiff's burden to show *what* the risk of harm was (e.g., how frequently such incidents occurred, the extent to which the risk can be mitigated by adequate training).") The evidence indicates that this is the first serious injury involving an overhead gantry milling machine. Between 1985 and 2006, Henri-Liné Tool[s] sold more than forty overhead gantry milling machines. There has never been a reported incident of a person suffering an injury while using one of these machines. Moreover, there are no reported incidents involving any overhead gantry milling machine, regardless of the manufacturer. Neither party is aware of any serious injuries or death caused by an overhead gantry milling machine, and Paul's experts testified that they were not able to quantify the probability of a similar accident occurring. On the other hand, Henri-Liné Tools' expert witness, Jack Auflick, testified that the likelihood of this accident occurring was minuscule.

> Paul is also unable to produce evidence of similar prior accidents involving an overhead gantry milling machine. Such prior accidents must be "substantially similar" to the accident at issue. *Croskey* [*v. BMW of N. Am., Inc.*, 532 F.3d 511,] 518 [(6th Cir. 2008)]. "Substantial similarity means that

the accidents must have occurred under similar circumstances or share the same cause." *Id.*; *see also Anderson v. Whittaker Corp.*, 894 F.2d 804, 813 (6th Cir. 1990) (substantial similarity existed where incidents involved same model boat, same hull design, same defect, and similar circumstances of water intake); *Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500 (6th Cir. 1998) (upholding decision to exclude data related to larger all-terrain vehicles in motorbike products liability case). "The plaintiff has the burden of showing the substantial similarity between prior accidents and his own." *Croskey*, 532 F.3d at 518.

Paul's expert witness, John Lauhoff, conducted a review of workplace accidents, in which he categorized as "similar" any incident that involved a rotating shaft, a failure to lockout [sic], or a failure to guard. (Lauhoff Dep. 127). As a result, he reported incidents which involved a wide variety of machine tools, ranging from forklifts and saws to scaffolding. *Id.* Injuries caused by such disparate tools are not relevant to the likelihood of injury caused by an overhead gantry milling machine. While accidents involving horizontal milling machines come closer to the mark, Paul has not established that the interaction between the operator and a horizontal milling machine is sufficiently similar to that of an overhead gantry milling machine.

*Paul*, 938 F. Supp. 2d at 699–700.

## 2.

Plaintiff argues that, contrary to Michigan law, the district court "accepted as conclusive" the evidence that there were no reports of other serious injuries or death involving overhead gantry milling machines. Plaintiff is correct that Michigan courts have long held that negative evidence, i.e., evidence regarding the absence of accidents, is inadmissible to show an absence of negligence. *See Grubaugh v. City of St. Johns*, 266 N.W.2d 791, 794 (Mich. Ct. App. 1978) ("[I]t has long been established in Michigan that evidence of the absence of previous accidents should not be admitted to prove absence of negligence."). Here, however, the absence of prior injury or death involving overhead-gantry milling machines was offered not to show the absence of negligence but to address the question of the likelihood of occurrence of injury resulting from use of HLMT's

7

machine; this is proper evidence when performing the risk-utility balancing analysis in a design-defect product-liability claim. *See e.g., Przeradski v. Rexnord, Inc.*, 326 N.W.2d 541, 544 (Mich. Ct. App. 1982) (holding in a products-liability action that "[t]he admissibility of the claim-free history of plaintiff's Model 65 cement mixer may have had a tendency to make the existence of a design defect less probable than it would be without such evidence," and that thus the trial court did not err in allowing the testimony).

Also without merit is Plaintiff's contention that the district court accepted "Defendant's argument that the only way to analyze 'likelihood of injury' from a product under Michigan's risk-utility test is to count the number of accidents." Appellant Br. at 37. Plaintiff is correct that in *Reeves v. Cincinnati, Inc.*, 439 N.W.2d 326, 339 (Mich. Ct. App. 1989), the Michigan Court of Appeals held that a plaintiff's failure to present statistical evidence of accidents does not doom a prima facie case where there is testimony that the product is in general unsafe and that an alternative design would have prevented the plaintiff's accident. Appellant Br. at 37-38. But in *Reeves*, unlike the instant case, the plaintiffs' expert presented evidence that *power presses in general* were prone to the type of malfunction that caused the plaintiff's injury. 439 N.W.2d at 330. The district court in the instant case cited *Reeves* and observed that Paul produced no testimony to "indicate that these machines were widely known to cause serious injuries." PageID 12750. Plaintiff's argument thus fails; the district court did not conclude that the only way to analyze likelihood of injury was to count accidents.

8

**3.**

Plaintiff also asserts that the district court overlooked expert Lauhoff's matrix-based risk analysis which, according to Plaintiff, constituted substantial admissible evidence supporting the proposition that the likelihood of injury from HLMT's machine is high.

Plaintiff's experts, John Lauhoff and Roberta Shea, testified on deposition that they knew of no serious injury or death involving an Henri-Liné machine or any overhead-gantry milling machine. PageID 220-23, 228-29, 233-34. Lauhoff's methodology was to search Occupational Safety and Health Administration (OSHA) and National Institute for Occupational safety and Health (NIOSH) databases. Plaintiff explains that:

> Mr. Lauhoff selected incidents involving industrial machinery in the NIOSH and OSHA databases that implicated the same hazards as are present on Defendant's machine. These are hazard categories of unguarded rotating shafts and unguarded energy sources (failure to lock-out). These are the data categories in the government accident databases for industrial machine tool incidents that specify the hazards from coming into contact with a rotating cutter head. These are the categories of incident reports that Mr. Lauhoff searched for and included in his list of similar incidents.
> . . . .
> Mr. Lauhoff's expert report identifies 17,455 OSHA inspections of machine tools for the period January 1, 1999 to January 1, 2001. During this period there were 99 fatalities, 220 injuries and 6,361 guarding deficiencies reported. These numbers equate to 36.4% of the inspections that identified guarding or lockout issues that if not corrected could result in an injury or death, 3.3% of the inspections that identified guarding or lockout issues that resulted in an injury, and .015% of the inspections that [] identified guarding or lockout issues that resulted in a fatality.

Appellant Br. at 45, 49-50.

Of the thousands of OSHA inspection reports Lauhoff identified as pertinent to this incident, none involved overhead-gantry milling machines, one involved a fatality of an operator of a CNC vertical milling machine, one involved a fatality of an operator of a

9

horizontal milling machine, and one involved a fatality of a maintenance machinist trainee entangled in a revolving shaft of a vertical boring mill. PageID 2283, 2284, 2286, 8484. Lauhoff's report does not state whether these machines were multi-axis versus single-axis, or high-speed versus low-speed. When asked on deposition how many of the incident reports involved multi-axis versus single axis machines, Lauhoff responded that he did not know. When asked how many were high-speed versus low-speed machines, he answered that he did not know. PageID 8481-82. When asked whether he knew the probability of an accident such as Paul's happening, Lauhoff responded, "no." PageID 8490. When asked "[H]ave you determined the probability of such an accident on an overhead gantry milling machine similar to this with the same safety measures that exist on this machine?" Lauhoff responded, "No, I haven't." PageID 219. Plaintiff's expert Roberta Shea similarly testified that she did not make any determination regarding the likelihood of occurrence of an injury. PageID 244-45.

**4.**

After Lauhoff and Shea were deposed and various motions in limine were filed, Lauhoff prepared an addendum to his report "to demonstrate an objective method of determining risk assessment in an industrial environment," referencing ANSI B-11.TR3-2000, a document titled: Risk Assessment and Risk Reduction-A Guide to Estimate, Evaluate and Reduce Risks Associated with Machine Tools. Lauhoff's addendum presented several methods of evaluating the severity of harm and probability of occurrence of harm, and concluded:

10

**Conclusion**

When performing a risk assessment one must look at the hazards that are presented for various operations of the equipment for which the risk assessment is being conducted. To do this properly it is not sufficient to look at the machine in whole. Each task must be studied separately. To say an injury has never occurred on a particular machine is misleading as the machine could present many different hazards, with each hazard having an abundant history of injuries and fatalities. Two examples of such hazards are pinch points and rotating shafts. It is uncontested that being caught in a pinch point area or entangled in a rotating shaft can result in a very serious injury, or death.

In my risk assessments I considered two major factors:

**Severity of harm**: This addresses the degree of injury that could occur.
**Probability of occurrence of harm**: This is estimated by taking into account the frequency, duration and extent of exposure, training and awareness, hazard presentation and human factors.

Human factors include but are not limited to:
Errors resulting from omitting steps, adding steps or performing steps out of sequence.
Effects of accumulated exposure (e.g., repetitive operation, noise, chemical exposure)
Risk assessment is not performed simply by estimating the likelihood that a particular error event will occur. Probability of occurrence is only one factor used to assess risk. The probability of a mishap must be balanced against severity of the consequences. Mathematical calculations of the probability of occurrence are not reliable because they are based on assumptions of unknowns. Instead, the probability of a mishap is judged on a simple scale such as whether the exposure is frequent, likely, possible, rare or unlikely. The risk assessments detailed in this report are standard techniques and procedures commonly used by industrial safety professionals to assess risk. Taking into consideration the severity of the harm and the probability of occurrence of harm, my opinion is that the risk from the Henri Line machine is at the critical or high level for each of the risk assessment methods detailed above. In my opinion the hazards from this machine are critical and require immediate, positive action to decrease the risk of harm to people exposed to the machine.

PageID 548-55.

11

Notwithstanding that Lauhoff's addendum itself states that the probability of occurrence of harm is estimated by taking into account the frequency, duration and extent of exposure, training and awareness, and the presentation of the hazard, Lauhoff did not determine or calculate how often operators of the overhead gantry are exposed to the cutting tool, PageID 8432, Lauhoff dep. at 115, and his reports make no mention of the extent of operator training, PageID 8441, Lauhoff dep. at 152-53, or that the presentation of the hazard, the cutting tool, was obvious and slow moving. PageID 8439, 8440, Lauhoff dep. at 144, 148; PageID 8376, Shea dep. at 100. Nor did Lauhoff's reports mention that at the time of the accident the cutting tool was running as Paul had programmed it to. Thus, even if Plaintiff is correct that the risk-evaluation matrix is one of several acceptable methods to satisfy the second element of Michigan's risk-utility balancing test, Lauhoff's analysis is incomplete and thus flawed in light of these deficits.

**5.**

Plaintiff's last argument relative to her defective-design claim is that the district court should have excluded as inadmissible the opinion on probability of HLMT's Human Factors expert because he is unqualified to make any such calculation and employed unreliable methods. Plaintiff cites no authority supporting that Human Reliability Analysis is not generally accepted and used to determine the probability of an incident in several contexts. And, it was Plaintiff's burden to show the likelihood of occurrence of the type of accident precipitating the need for a safety device. *Reeves*, 439 N.W.2d at 329. Even if the district court abused its discretion in admitting Auflick's opinion that the likelihood of a similar

12

accident occurring was miniscule, Plaintiff still would have failed to present sufficient evidence to establish a prima facie case of design defect.

The district court properly granted summary judgment on Plaintiff's design-defect claim for failure to establish a prima facie case. *See Reeves*, 439 N.W.2d at 329; *Cacevic*, 645 N.W.2d at 293.

## B. FAILURE TO WARN CLAIM

Plaintiff also argues that the district court improperly dismissed her claim that HLMT failed to warn that its machine was defectively designed and failed to conform to industry standards for guarding and safety assessment. Plaintiff asserts that the defect "is the absence of appropriate safeguarding devices, and the failure of [HLMT] to either assess the risk of its design or to inform its users that it had not performed the risk analysis." Appellant Br. at 55.

> A negligent failure to warn renders a product defective even if the design chosen does not render the product defective. *Gregory v. Cincinnati Inc.*, 450 Mich. 1, 11, 538 N.W.2d 325, 329 (1995). To establish a prima facie case of failure to warn, a plaintiff must prove: (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) the defendant's breach was a proximate cause of the plaintiff's injuries; and (4) the plaintiff suffered damages. *Id.* A manufacturer has a duty to warn if it has actual or constructive knowledge of a danger, which is not obvious to users, and the manufacturer failed to use reasonable care in informing users of the danger or the facts tending to make the condition dangerous. *See also* MCL 600.2948(2) (statute provides in pertinent part that "[a] defendant is not liable for failure to warn of a material risk that is or should be obvious to a reasonably prudent product user or a material risk that is or should be a matter of common knowledge to persons in the same or similar position as the person upon whose injury or death the claim is based in a product liability action.")

*Croskey*, 532 F.3d at 516 n.2.

13

Under Mich. Comp. Laws § 600.2947(4), "a manufacturer or seller is not liable in a product liability action for failure to provide an adequate warning if the product is provided for use by a sophisticated user." A "sophisticated user" is

> a person or entity that, by virtue of training, experience, a profession, or legal obligations, is or is generally expected to be knowledgeable about a product's properties, including a potential hazard or adverse effect. An employee who does not have actual knowledge of the product's potential hazard or adverse effect that caused the injury is not a sophisticated user.

Mich. Comp. Laws § 600.2945(j).

**1.**

Plaintiff's contention that HLMT failed to perform a risk assessment and failed to warn that it failed to perform a risk assessment of the overhead gantry is belied by the record. *See* PageID 11115-16, Jette dep. R. 86-2; PageID 11103-05, Def.'s Reply Br. in support of Mo. in Limine; PageID 12741-42. Louis Jetté, who oversaw the design and manufacture of HLMT's machine, testified that HLMT evaluated potentially installing fences or protective panels, but those were not feasible because Lincoln Park Boring did not know exactly what parts it was going to make. PageID 11115. HLMT also evaluated whether there was some way of keeping the operator on the operator's platform, i.e., away from the machine bed, while the machine was operating. Jetté testified that operators "are not only operating the machine, they have all kinds of other duties to do, like preparing tools, cleaning the floor, preparing materials for the next part, so they have to walk away from the platform." Testimony of employees of Lincoln Boring is in accord. Jetté added that when the machine is in automatic cycle, operators leave to go to the restroom, take breaks . . . "so it was not practical to keep the operator on the platform." PageID 11116. Jetté testified that

14

HLMT's training of the machine operators guarded against hazards that exist when the operator is on the machine bed. PageID 11121. In addition, Plaintiff's expert Lauhoff acknowledged on deposition that many overhead-gantry milling machines on the market in 2000 and 2001 had no guarding. PageID 8411.

**2.**

In any event, the record is clear that Lincoln Park Boring hired only highly experienced machine operators. Before working for Lincoln Park Boring, Paul had years of experience operating large milling machines and Computerized Numeric Control (CNC) machines, including those with Fanuc controllers like HLMT's machine. PageID 319. Lincoln Park Boring's head machine-tool operator, Frank Shafer, trained Paul in operating HLMT's machine for five to ten days, after which Paul operated it for six years, without incident.

Plaintiff's experts did not dispute that Paul and Lincoln Park Boring were aware of the potential for serious injury or death if the machine operator came in contact with the machine tool.[1] Nor did they dispute that the average person seeing the machine would understand that coming into contact with the tool would cause harm. *See Green v. AP*

---

[1]The machine's maintenance manual, which Paul read as part of training, stated:

> All persons assigned to work on the *Promill* 252 LS 4=2 must read and understand the relevant sections, and in particular the references to safety and hazards, before carrying out any work on or with the machine.
> . . . .
> Even when used strictly according to instructions, when working on or with the spindle inherent danger to life and limb of the user . . . still exists. [PageID 397, 399.]

15

*Prods.*, 717 N.W.2d 855, 861–62 (Mich. 2006) (Mich. Comp. Laws § 600.2948(2) does not require that a warning address possible injuries that might occur where the facts of record require the conclusion that the risk of serious harm from the asserted condition is open and obvious.); PageID 11105-06.

Because no genuine issue of fact remained whether Lincoln Park Boring and Paul were sophisticated users, the district court properly dismissed Plaintiff's failure-to-warn claim.

## C.  BREACH OF IMPLIED WARRANTY

Where the defendant in a design-defect suit is both the seller and manufacturer, as in the instant case, claims of negligence and breach of warranty are for all intents and purposes identical. *Hollister v. Dayton Hudson Corp.*, 201 F.3d 731, 736 (6th Cir. 2000) (applying Michigan law).  This is because

> a plaintiff alleging breach of implied warranty on the part of a seller must show that the purchased product was defective.  That showing, in turn, requires proof that the product's manufacturer acted negligently, typically by omitting a safety feature or in failing to give warning of a latent danger.  A suit for breach of implied warranty against a seller who is also the manufacturer will therefore require the same showing of negligence on the defendant's part as an ordinary products liability suit against a manufacturer.

*Id*. at 737 (citing *Prentis*, 365 N.W.2d at 186).

Plaintiff's response to HLMT's motion for summary judgment argued only that "[i]mplied warranty claims do not require the plaintiff to specify the type of defect alleged: the mere showing that *something* went wrong consistent with the existence of a defect is sufficient." PageID 1217.  The district court properly dismissed this claim for the same reasons that the product design defect claim failed. *Prentis*, 365 N.W.2d at 186–87.  Finally,

16

to the extent that the implied warranty claim was based on a failure to warn, HLMT was entitled to rely on Lincoln Park Boring, the purchaser and a sophisticated user, to warn Paul of the dangers associated with the overhead gantry. *Rasmussen v. Louisville Ladder Co.*, 536 N.W.2d 221, 223 (Mich. Ct. App. 1995), *rejected on other grounds*, *Meagher v. Wayne State Univ.*, 565 N.W.2d 401, 409 (Mich. Ct. App. 1997).

The district court did not address the gross negligence claim in light of its dismissal of the remaining claims. PageID12754. We find no error. Plaintiff failed to present proof of conduct "so reckless as to demonstrate a substantial lack of concern for whether an injury results," as required under Mich. Comp. Laws § 600.2945(d).

## III.

We AFFIRM the district court's grant of summary judgment to Henri-Liné Machine Tools.