*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JONATHAN M. VIRGILIO and DEIRDRE M.
VIRGILIO,

Plaintiffs-Appellants,

v

PEGGY A. KASUL and BRUCE P. KASUL,

Defendants-Appellees

and

PIONEER STATE MUTUAL INSURANCE
COMPANY,

Defendant.

UNPUBLISHED
January 11, 2024

No. 364346
Kent Circuit Court
LC No. 19-010824-NI

Before: RIORDAN, P.J., and YATES and FEENEY, JJ.

PER CURIAM.

Plaintiffs Jonathan and Deirdre Virgilio appeal by right from the judgment entered by the trial court on November 10, 2022, and more specifically the court's denial of their motion for a directed verdict as to causation. We affirm.

## I. FACTUAL BACKGROUND

On Friday, September 8, 2017, defendant, Peggy Kasul, drove into the intersection of Buchanan Avenue and 32nd Street in Wyoming, Michigan as her traffic light turned red and struck the rear driver's side of Jonathan's vehicle as he drove southbound on Buchanan Avenue. They each drove their vehicle to a nearby parking lot. Jonathan exited his vehicle and called his wife Deirdre to inform her of the accident. Police and paramedics were dispatched to the scene. Paramedics evaluated Jonathan and noted that he told them that he did not lose consciousness. They administered the Glasgow Coma Scale test and did not notice any type of problems. An ambulance transported Jonathan to a local hospital's emergency department where the attending

-1-

emergency room physician, Dr. Trihn Le, examined him and reported that Jonathan appeared appropriately alert and oriented to person, place, time, and surroundings. Dr. Le found no visible signs of injury to his head. Dr. Le examined his pupils and found them equal, round, reactive to light, and his eye movements were intact. Dr. Le found no neurological deficits or problems with spinal cord or brain function. The hospital discharged Jonathan and he went home. The next two days he did not complain of any problems. He went to Las Vegas on a business trip on Monday, September 11, 2017. He testified that the next day, after exercising and using the hotel pool, he attended a breakfast with his colleagues and began experiencing a headache and nausea. He went to his room and remained there until he flew home on Thursday, September 14, 2017.

The next day he went to the hospital emergency room where another emergency medicine doctor treated him for headaches, nausea and vision issues. Jonathan admitted at trial that, although he did not think he hit his head during the accident, he told this doctor that he had. The doctor referred Jonathan to the Mary Free Bed head and concussion clinic where he began treating with Dr. Jeffrey Kramer who placed him on work restrictions and prescribed Jonathan physical, speech, and occupational therapies, and referred him for counseling with a psychologist. Jonathan also struggled with depression and anxiety. Dr. Kramer released Jonathan from work restrictions in February 2018 because he determined that no medical reasons existed to restrict Jonathan any longer. He concluded that Jonathan had the ability to perform his job related duties and responsibilities. Dr. Kramer last saw Jonathan in August 2019. A month later, plaintiffs filed suit alleging that Peggy breached duties of care owed plaintiffs by negligently operating her motor vehicle causing the accident and Jonathan's injuries, and that Bruce Kasul, her husband, had vicarious liability for her negligent actions under MCL 257.401 as the owner of the vehicle that Peggy drove.

The case went to trial, and at the close of the parties' proofs, plaintiffs moved for a directed verdict on the issue of causation and the issue of no-fault threshold injury. Defendants opposed the motion. The trial court denied the motion regarding both issues plaintiffs raised. After hearing closing arguments, final instructions and deliberating, the jury returned a unanimous verdict that required them to first answer the question: "Was Peggy A. Kasul's negligence a proximate cause of Jonathan M. Virgilio's injuries?" The jury answered: "No." The trial court, therefore, entered judgment for Peggy.[1] This appeal followed.

## II. STANDARD OF REVIEW

"We review de novo a trial court's decision on a motion for a directed verdict." *Aroma Wines & Equip, Inc v Columbian Distribution Servs, Inc*, 497 Mich 337, 345; 871 NW2d 136 (2015) (citation omitted). "A party is entitled to a directed verdict if the evidence, when viewed in the light most favorable to the nonmoving party, fails to establish a claim as a matter of law." *Id*. (citation omitted).

---

[1] The trial court granted Bruce's motion for directed verdict and dismissed plaintiffs' claims against him with prejudice. The trial court also dismissed Defendant Pioneer State Mutual Insurance Company with prejudice upon plaintiffs' and Pioneer's stipulation.

III. ANALYSIS

Plaintiffs argue that the trial court erred by denying their motion for a directed verdict as to causation because they contend that the evidence established that the collision caused Jonathan's injuries and defendants failed to present evidence that established a question of fact in that regard. We disagree.

A party may move for a directed verdict at the close of the evidence offered by the opposing party. MCR 2.516; *Wickens v Oakwood Healthcare Sys*, 465 Mich 53, 59; 631 NW2d 686 (2001). The moving party must state the specific grounds supporting the motion. MCR 2.516. In *Anaya v Betten Chevrolet, Inc*, 330 Mich App 210, 215-216; 946 NW2d 560 (2019), this Court explained:

> A directed verdict is appropriate only when no factual question exists upon which reasonable minds could differ. In reviewing a directed verdict, we review all the evidence presented up to the time of the motion to determine whether a question of fact existed. In deciding whether a directed verdict is appropriate, the trial court must view the testimony and all legitimate inferences from the testimony in the light most favorable to the nonmoving party; we review the evidence in the same manner. The trial court may not substitute its judgment for that of the jury when the evidence could lead reasonable jurors to disagree. Directed verdicts are viewed with disfavor, particularly in negligence cases. [Citations omitted.]

When reviewing a motion for directed verdict, "it is the factfinder's responsibility to determine the credibility and weight of trial testimony." *King v Reed*, 278 Mich App 504, 522; 751 NW2d 525 (2008) (quotation omitted). It is the jury's prerogative to resolve issues of fact which include inherent credibility questions. *Moore v Detroit Entertainment, LLC*, 279 Mich App 195, 229; 755 NW2d 686 (2008). "If reasonable jurors could reach conclusions different than this Court, then this Court's judgment should not be substituted for the judgment of the jury." *Cacevic v Simplimatic Engineering Co (On Remand)*, 248 Mich App 670, 680; 645 NW2d 287 (2001).

To establish a prima facie case of negligence, a plaintiff must prove:

> (1) the defendant owed the plaintiff a legal duty, (2) the defendant breached the legal duty, (3) the plaintiff suffered damages, and (4) the defendant's breach was a proximate cause of the plaintiff's damages. [*Powell-Murphy v Revitalizing Auto Communities Environmental Response Trust*, 333 Mich App 234, 243; 964 NW2d 50 (2020) (citation omitted).]

"Tort liability is limited under the Michigan no-fault insurance act." *Patrick v Turkelson*, 322 Mich App 595, 606; 913 NW2d 369 (2018). Under MCL 500.3135(1), a "person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement." MCL 500.3135(1). "A 'serious impairment of body function' is defined by MCL 500.3135[(5)] as 'an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life.' " *Chouman v Home Owners Ins Co*, 293 Mich App 434, 441; 810 NW2d 88 (2011), citing MCL 500.3135(5). "Whether a plaintiff has suffered a serious impairment of body function is a

threshold question that the trial court should decide as a matter of law unless there is a material factual dispute regarding the nature and extent of the person's injuries . . . ." *Chouman*, 293 Mich App at 441 (quotation marks and citation omitted).

"Whether someone has suffered a serious impairment is inherently fact-and circumstance-specific and [the analysis] must be conducted on a case-by-case basis." *Id*. (quotation marks and citation omitted). "Therefore, the evidence must establish (1) an objectively manifested impairment of a body function, (2) that is significant or important to the specific injured person, and (3) that affects that specific person's general ability to lead his or her particular normal life." *Id*. "However, there is no bright-line rule or checklist to follow in making that evaluation." *Id*. An objectively manifested impairment is "evidenced by actual symptoms or conditions that someone other than the injured person would observe or perceive as impairing a body function." *McCormick v Carrier*, 487 Mich 180, 196; 795 NW2d 517 (2010). While mere subjective complaints of pain and suffering are insufficient to establish an impairment, evidence of a physical basis for that pain and suffering may be introduced to show that the impairment is objectively manifested. *Id*. at 198. The second requirement for a serious impairment is "an inherently subjective" one. *Id*. at 199. The focus is on whether the body function "has great value, significance, or consequence," and the relationship of that function to the person's life must be considered. *Id*. Lastly, the impairment affects the person's ability to lead a normal life if it has "an influence on some of the person's capacity to live in his or her normal manner of living." *Id*. at 202. This is a subjective inquiry, and does not require a "quantitative minimum as to the percentage of a person's normal manner of living that must be affected." *Id*. at 202-203.

"In a negligence action, a plaintiff must establish both factual causation, i.e., the defendant's conduct in fact caused harm to the plaintiff, and legal causation, i.e., the harm caused to the plaintiff was the general kind of harm the defendant negligently risked." *Ray v Swager*, 501 Mich 52, 63; 903 NW2d 366 (2017) (quotation marks and citation omitted). "The cause in fact element generally requires showing that 'but for' the defendant's actions, the plaintiff's injury would not have occurred." *Skinner v Square D Co*, 445 Mich 153, 163; 516 NW2d 475 (1994) (citation omitted); *Kroll v DeMorrow*, 505 Mich 954, 954 (2020). "To be adequate, a plaintiff's circumstantial proof must facilitate reasonable inferences of causation, not mere speculation." *Skinner*, 445 Mich at 164. "[A]t a minimum, a causation theory must have some basis in established fact." *Id*. "However, a basis in only slight evidence is not enough." *Id*. "Nor is it sufficient to submit a causation theory that, while factually supported, is, at best, just as possible as another theory." *Id*. "Rather, the plaintiff must present substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred. *Id*. at 164-165. "If factual causation cannot be established, then proximate cause, that is, legal causation, is no longer a relevant issue." *Ray*, 501 Mich at 64.

In this case, plaintiffs moved for a directed verdict on the issue of causation and relied on the evidence favorable to their argument that the accident caused Jonathan's alleged injuries. Defendants opposed the motion by pointing to the evidence that they contended indicated that Jonathan did not suffer an injury proximately caused by the accident and they argued that a question of fact existed requiring the jury to decide the issue. The trial court considered all of the evidence the parties presented at trial and concluded that a genuine issue of material fact required the jury's determination regarding the issue of causation. The trial court did not err in this regard.

The evidence established that the accident involved Peggy's vehicle striking Jonathan's vehicle in the driver's side by the rear wheel and bumper. Jonathan's car's airbags did not deploy. The paramedics who attended the scene indicated that Jonathan reported that he did not lose consciousness. At the scene after the accident, Jonathan walked around and telephoned Deirdre. Deirdre testified that he did not tell her that he lost consciousness or struck his head. A paramedic treating Jonathan at the accident scene reported that Jonathan did not report any injury to his head. Nothing demonstrated that he suffered any head trauma. The paramedic performed the standard Glasgow Coma Scale test and Jonathan received the highest possible score of 15 signifying no traumatic brain injury. The paramedic noted that Jonathan presented as properly oriented to his surroundings, his person, place, and time. Jonathan reported to the paramedic that he had not hit his head during the accident.

The evidence also established that Dr. Le, the emergency medicine physician with 20 years' experience who examined Jonathan at the hospital, found no objectively manifested head trauma. Jonathan complained of neck pain and blurry vision but otherwise presented nothing suggesting that he sustained a concussion or traumatic brain injury. Dr. Le reported that Jonathan was aware of his person, place, time, and situation. Dr. Le reported that Jonathan had no visible injury and he spoke appropriately. Dr. Le examined Jonathan's pupils and noted that they responded normally which indicated no brain injury. The hospital records indicated that Jonathan had not sustained any significant injury or concussion and the hospital discharged him.

Evidence also established that, for the next few days after the accident, Jonathan remained asymptomatic. Deirdre observed no symptoms and Jonathan complained of none.

Jonathan testified that he experienced headache, nausea, and vision issues while in Las Vegas on his business trip the day after he arrived there. He sought no medical treatment, however, until after he returned home. The record indicates that he went to the hospital emergency department the day after he got home and treated with a different physician who, based upon Jonathan's description of the accident and statement that he hit his head, referred him to Mary Free Bed's concussion clinic for possible post-concussion syndrome. Jonathan admitted that he told the doctor he hit his head despite not believing that happened. Jonathan began treating with Dr. Kramer of Mary Free Bed and disclosed to him that he had sustained up to 12 concussions previously from his participation in kickboxing and wakeboarding. Dr. Kramer testified that Jonathan submitted to a CT scan and MRI, but both of those tests were negative for any closed head injury. Dr. Kramer admitted that no objective tests confirmed any brain injury. Dr. Kramer placed Jonathan on work restrictions but by February 2018 he had improved significantly so that he released the work restrictions because Jonathan demonstrated that he could resume fulltime employment and perform the duties and responsibilities of his job.

Witnesses at trial testified regarding Jonathan's post-accident life including his work performance, family time, extensive vacation travel, and involvement in physical activities like rigorous exercise, surfing, and skiing. Some evidence indicated that Jonathan's work performance was impacted by his headaches and vision issues, but over time those diminished significantly and he had extensive periods of no headaches. The record established that he resumed fulltime employment and handled the rigors of his sales job and duties as a sales manager and worked 12-14 hour days.

Evidence also indicated that Jonathan experienced anxiety and depression. Jonathan attributed these to his accident. His treating psychologist's records, however, indicated that Jonathan reported significant physical improvement and successful resumption of work. The psychologist's records indicated that Jonathan reevaluated his work and personal life and expressed a desire to balance them. Testimony indicated that the psychologist's records also revealed that Jonathan experienced significant life stressors unrelated to his accident that caused his anxiety and stress. He also told the psychologist that stress from work caused his headaches.

"A directed verdict is appropriate only when no factual question exists upon which reasonable minds could differ." *Anaya*, 330 Mich App at 215. The factfinders bear responsibility to determine the credibility and weight of trial testimony. *King*, 278 Mich App at 522. The evidence presented at trial in this case establishes that a genuine issue of material fact existed regarding causation because reasonable minds could differ on whether the accident served as the cause in fact and proximate cause of Jonathan's alleged injuries. The record indicates that the trial court applied the correct legal analysis and appropriately determined that the jury should decide the issue of causation. Based on the record evidence, we are not persuaded that the trial court erred when it denied plaintiffs' motion for directed verdict.

Affirmed.

/s/ Michael J. Riordan
/s/ Christopher P. Yates
/s/ Kathleen A. Feeney